88 F.3d 1538
 45 Fed. R. Evid. Serv. 245, 97 Cal. Daily Op.
Serv. 5143,
96 Daily Journal D.A.R. 11,031,
96 Daily Journal D.A.R. 8275
UNITED STATES of America, Plaintiff-Appellee,
v.
Morreon B. RUDE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Stafford Y.L. MEW, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles E. ANDREWS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rodney H.S. KIM, Defendant-Appellant.
 Nos. 95-30198, 95-30205, 95-30207 and 95-30208.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 6, 1996.
Decided July 10, 1996.
As Amended on Denial of Rehearing and Rehearing En Banc
Sept. 10, 1996.*
 
 Charles A. Johnston, Felker, Lazares & Johnston, Tacoma, Washington, for defendant-appellant Rude.
 Ronald G.S. Au, Honolulu, Hawaii, for defendant-appellant Mew.
 Stephen E. Robinson, Fleeson, Gooing, Coulson & Kitch, Wichita, Kansas, for defendant-appellant Andrews.
 Ronald D. Ness, Port Orchard, Washington, for defendant-appellant Kim.
 Robert M. Westinghouse and Carl Blackstone, Assistant United States Attorneys, Seattle, Washington, for plaintiff-appellee.
 Appeals from the United States District Court for the Western District of Washington, Franklin D. Burgess, District Judge, Presiding. D.C. Nos. CR-94-05246-3, CR-94-05246-01, CR-94-05246-06 and CR-94-05246-02.
 Before LAY,* WRIGHT and LEAVY, Circuit Judges.
 LAY, Circuit Judge:
 
 
 1
 These consolidated appeals involve a scheme to defraud investors, including Unity House, Inc., a Hawaii non-profit corporation, of several million dollars. Morreon B. Rude, Rodney H.S. Kim, and Stafford Mew appeal their judgments of conviction for wire fraud, money laundering, and conspiracy. Charles Andrews, who pleaded guilty to one count of testifying falsely before a grand jury in exchange for cooperation in the prosecution of the other defendants, appeals his sentence. We affirm.
 
 THE "PRIME BANK NOTE" SCHEME
 
 2
 At trial the government adduced evidence that the defendants conspired to induce investments in what they termed "prime bank note" transactions.[1] The subject transactions were described to potential investors as a form of international bank paper purchased from issuing banks at a discount and sold to wholesale banks for a profit. Defendants held themselves out as persons experienced in such transactions and assured potential investors that the notes would yield monthly returns of roughly two to five percent. They further represented that the investments would not be at risk and in fact would remain in the investors' own accounts. Each of these representations was false.
 
 
 3
 The scheme began in May 1992, when Morreon Rude and Stafford Mew incorporated North Pacific Investments, Inc. ("NPI"), a Washington corporation, as a means of perpetrating defendants' fraudulent activities.
 
 
 4
 In December 1992, after several furtive attempts to sell the notes to third parties, representatives of Unity House, a Hawaii non-profit company with assets of more than $50 million, agreed to invest $10 million in the notes. They asked Roderick Rodriguez, the executive director of Unity House, to contact Bank of America to obtain a letter of credit, but Bank of America declined. Mew, NPI's principal, offered to procure a letter of credit from a European bank on behalf of Unity House. Mew represented that an account for Unity House could be opened at Credit Suisse in Geneva, Switzerland, and that the money would remain in the bank earning interest. The representatives of Unity House accepted Mew's proposal. Anthony Rutledge, the president of Unity House, and Mew signed a Limited Power of Attorney and a Private Participation Agreement, each prepared by Kim, authorizing the arrangement, whereunder NPI was given a general power of attorney in order to transfer funds out of the Credit Suisse account. Mew then enlisted the help of Charles Andrews, a commodities broker with a seat on the Chicago Mercantile Exchange, who met him in Geneva, Switzerland to establish the account. On January 19, 1993, Unity House transferred $10 million to the Credit Suisse account.
 
 
 5
 Between February and April 1993, Mew effected transfers of all $10 million from Credit Suisse to NPI's account at Seafirst Bank. In April, Rutledge received a letter from Mew stating that NPI was holding $625,000 in earnings for Unity House, and in July 1993 Rude transferred $650,000 to Unity House. Unity House was not aware, however, that the money was simply part of its original investment; it understood the payment as a return on its investment, and in fact did not learn of NPI's activities until September 1993, when Rutledge was interviewed by law enforcement agents. In addition, Mew and Rude transferred $2 million to a discretionary account from which Andrews traded until November, when the remaining $350,000 was seized. Andrews received $400,000 in commissions during the course of the trading, and the balance of that $2 million was lost. Another substantial portion of the money was deposited in various accounts and used to trade stocks and commodities, generating losses of approximately $3,667,000. Federal agents seized most of this money. Of the remaining funds, Mew and Rude together received $588,538; Kim received $106,666; and Gonzales received $792,000. The defendants never purchased any prime bank notes or letters of credit, though they maintain that they attempted to do so.
 
 
 6
 Law enforcement investigations led to a grand jury proceeding in August 1993. Rude then first admitted that Unity House was the source of the $10 million transferred to NPI's Seafirst account. He claimed the money was a loan, and records he produced referred to the transaction as such. In November 1993, federal agents seized the funds in NPI's various accounts. Kim, Rude, Mew, and Jack Gonzales[2] were indicted on April 20, 1994.
 
 
 7
 Andrews appeared before a grand jury in Seattle on December 15, 1993. During his testimony, he failed to disclose the number of times he had met Mew, in an effort to conceal the fact that he and Mew had been in Switzerland to set up the Credit Suisse account. On September 14, 1994, the grand jury returned a superseding indictment charging Andrews, along with Mew, Kim, and Gonzales, with conspiracy, wire fraud, and money laundering. Andrews was also charged with making a false declaration to the grand jury. He later admitted that he had testified falsely and entered a plea to that charge in exchange for his agreement to cooperate in the prosecution of the other defendants.[3] The remaining four defendants proceeded to trial, and a jury convicted them on all counts on March 21, 1995. Kim, Rude, and Mew were sentenced on June 9, 1995.[4]
 
 CHARLES ANDREWS
 
 8
 Andrews argues that the district court erred in the imposition of his sentence by failing to make factual findings requisite to the application of U.S.S.G. § 2J1.3(c)(1) (1994), which provides:
 
 
 9
 If the offense involved perjury, subornation of perjury, or witness bribery in respect to a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above.
 
 
 10
 Andrews acknowledges that cross-referencing U.S.S.G. § 2X3.1 would have been appropriate had the district court found that he committed perjury "in respect to" the criminal offense of money laundering, for which his co-defendants were convicted, but suggests the court applied § 2X3.1 notwithstanding its failure to make such a finding, thus violating both § 2J1.3 and Fed.R.Crim.P. 32(c)(3)(D). Although he objected to the presentence investigative report's characterization of the facts, he suggests the court simply deferred to the probation officer's recommendation to cross-reference § 2X3.1 without addressing his objections.
 
 
 11
 Contrary to Andrews' claim, we find that the district court was aware that it needed to make such a finding, and that it did so. See Excerpts of Record D at 28 ("[T]hat will be my finding, that the offense level will be based on that cross reference."). Rule 32(c)(1) does not require the court to articulate the reasoning for its finding. See United States v. Karterman, 60 F.3d 576, 583 (9th Cir.1995); United States v. Fagan, 996 F.2d 1009, 1016 (9th Cir.1993); United States v. Peters, 962 F.2d 1410, 1415 (9th Cir.1992). Although the court did not articulate the facts upon which it relied in ruling as it did, we are satisfied that the requisite finding was made.
 
 
 12
 The remaining issue is whether the court's finding that Andrews committed perjury in respect to the money laundering offenses of his codefendants was justified. U.S.S.G. § 2J1.3(c)(1) requires only that the defendant's perjury be "in respect to a criminal offense" for cross-referencing to be justified. The Guideline requires neither that the defendant have committed perjury in respect to his own criminal offense, nor that he have committed perjury in respect to an adjudicated criminal offense. Provided an indictment and conviction are forthcoming, as they were here, and so long as the defendant knew or had reason to know, at the time of his perjury, that his testimony concerned such a criminal offense, the "in respect to" element of § 2J1.3(c)(1) is satisfied.
 
 
 13
 At the time of his perjured testimony, Andrews knew that Mew was under investigation for money laundering and wire fraud, as verified by a memorandum he prepared and sent to Mew following his interview with federal agents, and the seizure warrant itself, which detailed the factual basis for the forthcoming allegations. Andrews also knew that Mew did not want him to tell the grand jury about the Credit Suisse account--a fact which belies his claim that he thought the charges arose from a legitimate business transaction. These facts demonstrate that Andrews' perjury was "in respect to" the other defendants' money laundering offenses. We find no error in the district court's sentencing of Andrews.
 
 RUDE, KIM, AND MEW
 
 14
 Rude, Kim, and Mew jointly and individually have raised various claims on appeal. They challenge (1) the sufficiency of the evidence to sustain their convictions; (2) the legal sufficiency of the Superseding Indictment and the government's variance therefrom; (3) multiple aspects of the jury instructions; and (4) the conduct of the prosecution during trial.[5] Mew raises separate claims that the district court erroneously (1) admitted evidence of other crimes involving fraudulent misconduct under Fed.R.Evid. 404(b); (2) denied his motion for a continuance; and (3) denied his motion to suppress evidence which was allegedly illegally seized from his residence.
 
 THE SUFFICIENCY OF THE EVIDENCE
 
 15
 Defendants claim that the evidence was insufficient to support their wire fraud convictions, under Counts One through Five, for violating 18 U.S.C. § 1343. They observe that they were not charged with wire fraud for the initial wiring of funds from Hawaii to Credit Suisse, but rather for the transfers of funds from Credit Suisse to Seafirst Bank, and for returning funds to Unity House in the sum of $650,000. Defendants maintain that the latter transfers were not in furtherance of the fraud, as the wire fraud was completed at the point when Unity House wired $10 million from Hawaii to Credit Suisse. If the wire fraud counts cannot be sustained, their argument continues, their convictions for money laundering and conspiracy must also be overturned, since the latter counts were dependent upon the underlying wire fraud convictions. In support of these contentions, defendants rely upon United States v. Lane, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), and Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944).
 
 
 16
 The defendants' argument is without merit, for it is clear that the $650,000 wire transfer, as well as the transfers from Credit Suisse to Seafirst, the defendants' bank, were at a minimum either "incident to an essential part of the scheme," or "a step in [the] plot." See Schmuck v. United States, 489 U.S. 705, 711, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989) (quotations omitted) (alteration in original). The monies returned to Unity House, for example, were intended to create the impression that Unity House was earning an immediate, substantial return on its investment, as promised by the defendants. This transfer therefore was not only relevant to the fraudulent conspiracy, but extended the overall scheme by " 'lull[ing] the victims into a false sense of security, postpon[ing] their ultimate complaint to the authorities, and therefore mak[ing] the apprehension of the defendants less likely than if no [transfers] had taken place.' " See Lane, 474 U.S. at 451-52, 106 S.Ct. at 733 (quoting Maze, 414 U.S. at 403, 94 S.Ct. at 650); see also United States v. Sampson, 371 U.S. 75, 80-81, 83 S.Ct. 173, 175-76, 9 L.Ed.2d 136 (1962). The instant case is distinguishable from the fraudulent credit card scheme involved in Maze, where the goods were immediately obtained by the fraud, and where parties other than the defendants completed the underlying mail transfers. See 414 U.S. at 402-05, 94 S.Ct. at 649-51.
 
 
 17
 Regarding the transfers from the Credit Suisse account to Seafirst, the defendants overlook the fact that their fraud was not complete until the $10 million deposited in Credit Suisse (in Unity House's account) was within their complete control. Unity House was falsely promised that its money would remain in the Credit Suisse account. Although effecting a transfer to Credit Suisse was a step in the scheme, the final steps did not occur until defendants effected transfers to and from the Seafirst account, thus placing the funds outside of Unity House's account, outside of the scope of Unity House's authorization, and within their own control. See United States v. Sindona, 636 F.2d 792, 802 (2d Cir.1980) ("A scheme to defraud is not complete until the proceeds have been received and use of the mail or wires to obtain the proceeds satisfies the jurisdictional element."), cert. denied, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). Thus, we find the evidence sufficient to sustain the wire fraud counts.
 
 Specific Intent
 
 18
 Rude suggests the only evidence offered to prove that he possessed the requisite specific intent to defraud concerned his acts in arranging the $650,000 wire transfer to Unity House and in wiring notes of corporate minutes unrelated to the case. We have already rejected Rude's argument that the wire transfers to and from the Seafirst account, including the transfer to Unity House, were not part of the scheme to defraud. As to his claim that his involvement was otherwise limited to wiring corporate minutes, a review of the record does not support this assertion.
 
 
 19
 The prosecution presented evidence that Rude: acted as the front man who incorporated NPI; opened bank and brokerage accounts; at least once lied concerning the corporation's equity and income; structured transactions through the accounts he established to avoid filing Currency Transaction Reports; concocted board minutes; wired a portion of Unity House's own money back to it as a purported return on their investment, knowing that no return had been earned; transferred several millions to other accounts and to himself; and falsely stated to law enforcement authorities and a federal grand jury that NPI simply had invested its own funds. A review of the record evidence plainly shows that Rude specifically intended to participate in the conspiracy.
 
 
 20
 Kim contends that there is no support for the prosecution's repeated assertions that he was more than the attorney who drafted the Limited Power of Attorney and Private Participation Agreement in the Unity House transaction. He suggests he lacked knowledge of the five bank wires comprising the bases for the charges and, like Rude, maintains that proof of specific intent may not be based on constructive knowledge of facts known to others.
 
 
 21
 We disagree. On several occasions, Kim solicited prime bank note transactions; falsely claimed to have learned the trade while seeking funding for a client in Europe in the 1980s; and represented that the prime bank notes would yield absurdly high returns. He assured that the deal with Unity House would close by preparing the Private Participation Agreement and Limited Power of Attorney, which falsely represented that NPI was experienced in prime bank note transactions. He also structured the conversion of a portion of currency checks payable to Mew and, finally, offered Roberta Cabral, a Unity House marketing agent, a bribe to take responsibility for false promises made in one of NPI's subsequent, unsuccessful prime bank note presentations. Viewing this evidence in the light most favorable to the government, Kim clearly intended to further the fraudulent scheme.
 
 THE SUPERSEDING INDICTMENT
 
 22
 The defendants' initial challenge to the legal sufficiency of the superseding indictment is similar to their challenge to the sufficiency of the evidence. As recited above, defendants claim that the fraudulent scheme was complete once Unity House wired the $10 million to the Credit Suisse bank account established in Unity House's name and that, in consequence, the wirings of the $10 million to NPI's Seafirst account were not in furtherance of the scheme and therefore not actionable. Rude and Kim urge that Stafford Mew was the sole signatory with a general Power of Attorney on Unity House's account, and suggest there is no evidence to show that they even knew of those documents or the limited transfer from Unity House to Credit Suisse. The defendants, however, took integral steps in the fraudulent scheme when they effected transfers of money from Credit Suisse to their Seafirst account in the state of Washington. We thus reject this contention.
 
 
 23
 The defendants also assert that there was a prejudicial variance between the charges against them and the proof offered at trial. The Superseding Indictment charged a scheme to defraud investors, including Unity House, through investments involving the purchase and sale of prime bank debt obligations. It is clear that the Unity House solicitation was part of a single broad scheme of fraud which took place over a roughly two-year period. We find no prejudicial variance between the Superseding Indictment and the evidence adduced by the government.
 
 
 24
 Along the same line, the defendants claim that the Superseding Indictment was multiplicitous because they were punished twice for the same offense. They assert that the money laundering Counts, Six through Eleven, are merely a relabeling of the five bank wirings charged in the wire fraud Counts, One through Five. We find no merit to this claim. An indictment is multiplicitous if it charges a single offense in several counts. See, e.g., United States v. UCO Oil Co., 546 F.2d 833, 835 (9th Cir.1976), cert. denied, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). It is well established, however, that money laundering and wire fraud are separate offenses. See United States v. LeBlanc, 24 F.3d 340, 346 (1st Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994); United States v. Piervinanzi, 23 F.3d 670, 680 (2d Cir.), cert. denied, --- U.S. ---- & ----, 115 S.Ct. 259 & 267, 130 L.Ed.2d 179 & 185 (1994); see also United States v. Edgmon, 952 F.2d 1206, 1214 (10th Cir.1991), cert. denied, 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992).
 
 JURY INSTRUCTIONS
 
 25
 The defendants raise several challenges to the district court's jury instructions. Specifically, they claim that the court erred in failing to instruct the jury concerning a single scheme to defraud; in instructing the jury that the defendants need not have succeeded in obtaining money or property or in causing others to lose money through their scheme; in instructing the jury on aiding and abetting liability; and in shifting the burden of proof from the prosecution to the defense.[6]
 
 Single Scheme to Defraud
 
 26
 Defendants argue that the court erred in failing to instruct the jury concerning the requirement that they find a single scheme to defraud, as alleged in the indictment. They rely on United States v. Mastelotto, 717 F.2d 1238, 1247 (9th Cir.1983), which held:
 
 
 27
 In a ... wire fraud case in which a defendant contends that a variance has occurred between the single scheme charged in each count of the indictment and the proof at trial, the jury must be instructed that each of the jurors must find the defendant guilty of participation in the same single scheme to defraud and that the scheme to defraud in which the defendant is found to have participated is the same scheme as the overall fraudulent scheme alleged in the indictment.
 
 
 28
 If the jurors are not instructed that they must all agree on the existence of the same scheme to defraud, the defendant's right to a unanimous jury verdict as guaranteed by article III, § 2 of and the sixth amendment to the United States Constitution is infringed.
 
 
 29
 Defendants assert that Instructions 16, 17, 18, and 22, which pertain to the charges of a scheme, failed to meet this standard.
 
 
 30
 We find that the instructions were proper and did not deprive the defendants of their constitutional rights. Although, as we have concluded, the Superseding Indictment charged and the proof offered supported a finding of a single scheme, Instruction 16 stated in relevant part:
 
 
 31
 In order for a defendant to be found guilty of [wire fraud], the Government must prove each of the following elements beyond a reasonable doubt:
 
 
 32
 First, the defendant made up a scheme or plan to defraud individual and organizational investors, including Unity House, Inc., and to obtain money from the investors by means of false promises or statements, with all of you agreeing on at least one particular false promise or statement that was made;
 
 
 33
 ....
 
 
 34
 (Emphasis added.) Instruction 18 stated:
 
 
 35
 The scheme to defraud charged in the Superseding Indictment is made up of various acts. It is not necessary for the Government to prove all of them, as long as sufficient evidence is shown to establish beyond a reasonable doubt that the scheme, substantially as charged, was set up.
 
 
 36
 (Emphasis added.) Thus, the instructions required both a unanimous finding concerning the existence of the underlying false statements and a specific finding that the scheme found matched that charged in the Superseding Indictment. We find these instructions proper.
 
 The Successfulness of the Scheme
 
 37
 Defendants also challenge Instruction 22, which stated:
 
 
 38
 It is not necessary for the Government to prove that the defendants were actually successful in obtaining money or property by means of false or fraudulent pretenses, representations, or promises. It is not necessary for the Government to prove that anyone lost any money or property as a result of the scheme or plan.
 
 
 39
 An unsuccessful scheme to defraud is as illegal as a scheme or plan that is ultimately successful.
 
 
 40
 This instruction correctly states the law, in that the mail and wire fraud statutes do not proscribe only successful schemes. See, e.g., United States v. Olson, 925 F.2d 1170, 1175 (9th Cir.1991).
 
 Aiding and Abetting Liability
 
 41
 Defendants next challenge Instructions 24 and 34, which instructed the jury concerning aiding and abetting liability. They assert that this was plain error, as no defendant was separately charged with aiding and abetting under 18 U.S.C. § 2.
 
 
 42
 We disagree. Each of the wire fraud and money laundering Counts charged violations of 18 U.S.C. § 2. Moreover, it is well settled that "aiding and abetting are implied in every indictment" for a substantive offense. United States v. Armstrong, 909 F.2d 1238, 1242 (9th Cir.), cert. denied, 498 U.S. 870, 111 S.Ct. 191, 112 L.Ed.2d 153 (1990).
 
 Burden of Proof
 
 43
 Finally, defendants contend that Instructions 28-31 and 34-37, read together, effectively shifted the burden of proof from the government to them. Defendants' arguments are unsupported by any authority and fail to delineate the manner in which they were prejudiced. We have reviewed them individually and as a whole, and we find no prejudicial error. Those instructions containing the substantive elements of the offenses charged each state, in no uncertain terms, that the government bore the burden of proving its case "beyond a reasonable doubt."
 
 THE PROSECUTORIAL MISCONDUCT CLAIMS
 
 44
 The defendants urge that they were deprived of a fair trial by prosecutorial misconduct.
 
 Inflammatory Language
 
 45
 The defendants first allege that the prosecutor's opening statement was peppered with inflammatory jingles such as "scam," "Ponzi Scheme," "gibberish," "victim," "outlandish," "charlatan," "con," "deceit," "misrepresentation," "falsehoods," "fool's mission," "fictitious business entity," "store front office," and "front person." They acknowledge that each statement itself may have been harmless, but suggest that their cumulative effect crossed the line between permissible oratorical tactics and comments calculated to incite jury prejudice. They maintain that this prejudicial conduct persisted throughout the trial, including the prosecution's statements in closing argument. They suggest the prosecutors referred to the defendants as "crooks" or "evil" at least eleven times; used terms or phrases such as "con man," "charlatans," "trolling around for victims," "lie," "lies," or "lied" over 90 times; and also used words such as "Ponzi Scheme," "practicing their craft," "perfecting their craft," and "victim."
 
 
 46
 The parties dispute whether defendants objected to the government's use of inflammatory words at trial.[7] Resolving this issue in the defendants' favor, we nonetheless conclude that the district court did not abuse its discretion in failing to grant a mistrial (which was not requested by the defendants) or in sustaining any objection. The district court specifically found that "[t]he opening and closing remarks, while containing an element of righteous indignation, were within the boundaries of proper openings and summations." We agree. The terms "victim," "deceit," "misrepresentation," "falsehoods," "fictitious business entity," "outlandish," "gibberish," and even "charlatan" and "scam," for example, are not even properly characterizable as slang.[8] Moreover, the law permits the prosecution considerable latitude to strike "hard blows" based on the evidence and all reasonable inferences therefrom. United States v. Baker, 10 F.3d 1374, 1415 (9th Cir.1993), cert. denied, --- U.S. ----, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994).
 
 
 47
 Viewed in their entirety and in the context of the month-long trial below, the government's choice of terms and phrases was not overly repetitious, and in fact reasonably described the practices of defendants. As noted in Guam v. Torre, 68 F.3d 1177, 1180 (9th Cir.1995), "there is no rule of evidence or ethics that forbids the prosecutor from referring to the crime by its common name when examining a witness. There is no rule requiring the prosecutor to use a euphemism for it or preface it by the word 'alleged.' " See also United States v. Bracy, 67 F.3d 1421, 1431 (9th Cir.1995) (upholding prosecution's reference to defendant as " 'the imminent source of evil in this courtroom-at this moment' "); United States v. Taxe, 540 F.2d 961, 968 (9th Cir.1976) (upholding in fraud case use of terms "fraud," "scavenger," "parasite," and "professional con-man"), cert. denied, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). Although there is a point at which prosecutorial comments are no longer reasonably descriptive and therefore serve no purpose other than to incite prejudice in the jury, the prosecution did not cross that point here, and we decline to impose formalistic restrictions on its vocabulary. For this reason, we also find no prejudicial error in the allowance of the prosecution's statements in closing argument.
 
 The Charge of Mischaracterization
 
 48
 The defendants also allege that the government mischaracterized their activities by implying that trading in prime bank notes was a wholly fictitious concept, despite the contrary testimony of its own witness, Agent Steven Studhalter, who defined the term "prime bank."
 
 
 49
 It is true that the prosecution may neither "assume prejudicial facts not in evidence," nor "insinuate the possession of personal knowledge of facts not offered in evidence." Torre, 68 F.3d at 1179-80. Here, however, the government presented other testimony from which the jury could conclude beyond a reasonable doubt that the very notion of a "prime bank note" was fictitious. Neal Aoki, an attorney employed by the Hawaii Securities Enforcement Unit, testified that the term "prime bank" had no meaning in the financial industry and was commonly associated with fraud schemes. A juror could reasonably infer from this testimony that defendants' business activities were a front. We thus cannot conclude that the government made prejudicial claims not supported by evidence.[9]
 
 Vouching
 
 50
 Defendants' final allegation of prosecutorial misconduct is a claim of impermissible prosecutorial vouching. The prosecution openly greeted a witness passing in front of the jury box. Rude's counsel objected, but the court simply admonished the prosecution; it did not provide curative instructions to the jury. The defendants suggest this was impermissible vouching and grounds for reversal.[10]
 
 
 51
 This argument misconceives the doctrine of vouching, which applies where the prosecutor personally assures the jury concerning a witness's credibility or expresses a personal opinion regarding the defendant's guilt. Cf. United States v. Williams, 989 F.2d 1061, 1071 (9th Cir.1993); United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir.1993). In fact, only one witness extended his hand to the prosecutor, and our research revealed no case suggesting it is improper for a prosecutor, without more, simply to shake hands with a witness upon the close of his testimony in the jury's presence. A prosecutor's open handshake with a witness neither lends governmental imprimatur to his testimony nor personally assures the jury of its credibility.
 
 404(b) EVIDENCE
 
 52
 Mew asserts that the court erred in refusing to grant his motion to exclude evidence of other fraudulent transactions relating to him and dating back to 1986. At trial, two witnesses, Brian Ajifu and Norman Frank, testified concerning Mew's prior fraudulent practices. Ajifu testified that he was enticed to invest $50,000 in a similar scheme by Mew's representation, through a company with which he associated, ADR Industries ("ADR"), that he would earn five times his investment within two to three months. Subsequently, when Ajifu told Mew that he had contacted the FBI, Mew told him not to say anything and to treat the invested funds as a loan. Frank likewise testified that, near the same time, Mew promised him a 25% return on his investment in three months. Frank initially invested $85,000, but when Mew told him his investment had doubled, he invested another $50,000, all of which was lost. Mew acted through IBI Financial ("IBI"), another business entity, during this period. Prior to trial, Mew filed a motion in limine to exclude the testimony under Fed.R.Evid. Rule 404(b), which was denied. We review its denial for an abuse of discretion. United States v. Luna, 21 F.3d 874, 878 (9th Cir.1994).
 
 
 53
 Mew suggests the testimony of Ajifu and Frank was irrelevant to the Unity House transaction, remote in time, and insufficient to support a finding that he committed the other acts. He also notes that this court "has specifically incorporated Rule 403's probative value/unfair prejudice balancing requirement into the Rule 404(b) inquiry," United States v. Mayans, 17 F.3d 1174, 1183 (9th Cir.1994), and suggests the court below failed to conduct a Rule 403 analysis.
 
 
 54
 The admission of this evidence withstands the four-part analysis of United States v. Spillone, 879 F.2d 514, 518-20 (9th Cir.1989), cert. denied, 498 U.S. 864 & 878, 111 S.Ct. 173 & 210, 112 L.Ed.2d 137 & 170 (1990), which holds that prior bad acts evidence is admissible if it (1) tends to prove a material point; (2) is not too remote in time; (3) is sufficient to support a finding that the defendant committed the other act; and (4) in some cases, concerns an offense similar to that charged. The testimony was relevant to demonstrate defendants' fraudulent intent, as it established that Mew was not simply a highly optimistic, but negligent, investor. See United States v. Sarault, 840 F.2d 1479, 1485 (9th Cir.1988); United States v. Jenkins, 785 F.2d 1387, 1395 (9th Cir.), cert. denied, 479 U.S. 889, 107 S.Ct. 288, 93 L.Ed.2d 262 (1986).
 
 
 55
 We also find the challenged evidence reliable. Both Ajifu and Frank testified that Mew employed similar, fraudulent investment tactics, around the same period in time, to induce them to invest. Their testimony not only was specific concerning the nature of the transactions and the promised returns, but was corroborated by documentary evidence and sufficient to support a finding that Mew committed the alleged frauds. The schemes were strikingly similar to the charged offenses, as each involved "prime bank" notes and related instruments, and each involved promises of high rates of return. Nor were the prior acts too remote in time.
 
 
 56
 Given the similarity and relevance of the offenses, we are not troubled by the fact that they occurred seven and eight years earlier. This circuit has not adopted a bright line rule concerning remoteness in time, Spillone, 879 F.2d at 519, and, where the prior acts were similar to those charged, previous decisions have upheld admission of evidence of acts up to twelve years old. See United States v. Ross, 886 F.2d 264, 267 (9th Cir.1989) (acts occurring twelve years ago not too remote), cert. denied, 494 U.S. 1083, 110 S.Ct. 1818, 108 L.Ed.2d 947 (1990). As to Mew's claim that the court below failed to apply Rule 403, we note that the court specifically found that the probative value of the evidence "outweigh[ed] any prejudice which may be present." This argument is therefore meritless as well.
 
 CONTINUANCE
 
 57
 Mew also contends that the district court erred in denying his request for a continuance. He asserts that he lacked time to prepare an adequate defense, given the massive production of exhibits and documents no more than 11 or 12 days prior to trial. This lack of time, and the case's complexity and his pre-trial detention, assertedly deprived him of a fair trial.
 
 
 58
 We review a trial court's ruling on a request for a continuance under an abuse of discretion standard. It is settled that we will reverse only if the decision is "arbitrary and unreasonable." United States v. Tham, 960 F.2d 1391, 1396 (9th Cir.1991).
 
 
 59
 Although there was a concededly large volume of materials produced by the government in this case, the defendants were kept informed of this fact by three separate notices from the government. In addition, it provided an exhibit list two weeks prior to trial. Jencks materials were provided ten days before the first witness testified. See Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).
 
 
 60
 Furthermore, as the court recognized, a continuance would greatly have inconvenienced the government, the court, and out-of-state witnesses under subpoena. Nor has Mew shown the particular manner in which he was prejudiced by the denial of a continuance: he has not suggested he would have done additional investigation based on the new discovery, or that he was unable to use the discovery in cross-examining witnesses or in presenting his defense. In the absence of any particular proof of prejudice, we cannot say the court below abused its discretion in denying the continuance, particularly since it perceived a threat of flight. Moreover, the trial court found that defendant's counsel "came into the case with the understanding that if you couldn't come in and pick up the baton and keep the race going, that this was not the case to come into. I believe your assurance to the Court was that that would be no problem." Thus, we find no abuse of discretion.
 
 THE FOURTH AMENDMENT CLAIMS
 
 61
 Although each of the defendants' residences as well as the offices of NPI were searched, only Mew has standing to challenge the search of his residence.[11] The search warrant issued in the present case authorized the seizure of the following documents dating from May 1992 to the present and pertaining to the defendants and NPI:
 
 
 62
 Business records ... Bank account records ... Brokerage account records ... Credit card record statements and payment records ... Records of domestic and foreign travel ... Records pertaining to potential victims and associates, to include, but not be limited to, telephone toll records, letters, memos, correspondence, address books, diaries, photographs, video and audio recordings ... Currency and other valuable items, such as gold and jewelry, traceable to fraud and money laundering.
 
 
 63
 Mew asserts that the search warrant was overly broad in scope and failed to state with particularity any guidelines for the agents to determine objectively whether a document to be seized related to wire fraud or money laundering. He also argues that many of the documents seized by the government pre-dated May 1992, and that none of these documents pertained to NPI or to the Unity House fraud.
 
 The Validity of the Warrant
 
 64
 While a search warrant must describe items to be seized with particularity sufficient to prevent "a general, exploratory rummaging in a person's belongings," Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971) (plurality), it need only be "reasonably specific, rather than elaborately detailed," United States v. Brock, 667 F.2d 1311, 1322 (9th Cir.1982), cert. denied, 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983), and the specificity required "varies depending on the circumstances of the case and the type of items involved," United States v. Spilotro, 800 F.2d 959, 963 (9th Cir.1986).
 
 
 65
 The warrant here was sufficiently specific. As the district court noted, the warrant was limited to post-May 1992 documents, and to records pertaining to five individuals and one corporation. Any search for relevant documents is likely to retrieve some information that ultimately is beyond the core of evidentiary material produced at trial. An objective basis for distinguishing relevant documents from others is therefore necessary to ensure that the search is limited. Here, the specification of dates, individuals, and the NPI corporation, along with a reasonably precise delineation of the type of records sought, satisfied the specificity requirement. In In re Grand Jury Subpoenas Dated Dec. 10, 1987, 926 F.2d 847, 857 (9th Cir.1991), this court upheld a warrant authorizing the search of an attorney's office for documents because the list of documents sought "was qualified by the requirement that the document seized be 'in the name of or have reference to' [the defendant] or [the persons] or entities that had been linked to [the defendant] through the investigation." Such is the case here. Moreover, the agents did not conduct a wholesale seizure of Mew's records, but left "a large volume" behind. RT 12/16/94 at 137-38.
 
 
 66
 The district court's finding that Mew's business was "permeated with fraud," thereby justifying an extraordinarily broad seizure of documents, bolsters our conclusion. CR 107 at 6. See United States v. Offices Known as 50 State Distributing Co., 708 F.2d 1371, 1374-75 (9th Cir.1983) (broad search for business records is permissible if probable cause exists to believe fraud permeates the entire business operation), cert. denied, 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984). The affidavit supporting the search warrant validates the lower court's finding, as it is clear therefrom that NPI's central purpose was to serve as a front for defrauding prime bank note investors. Accordingly, we find that the warrant itself was neither overly broad nor insufficiently specific.
 
 The Plain View Doctrine
 
 67
 As to the seizure of material outside the scope of the warrant, the government concedes that its agents seized several documents pre-dating May 1992, but urges that these documents were properly seized under the "plain view" doctrine. Mew argues that, under the plain view doctrine, the incriminating character of the documents must be " 'immediately apparent.' " See Horton v. California, 496 U.S. 128, 136, 110 S.Ct. 2301, 2307-08, 110 L.Ed.2d 112 (1990) (quoting Coolidge, 403 U.S. at 466, 91 S.Ct. at 2038 (plurality opinion)). The record reveals that the agents had to peruse each document to determine whether it related to other fraudulent activity.
 
 
 68
 The government maintains that the pre-May 1992 documents pertained to Mew's prior fraudulent activities with IBI and ADR, concerning which they had probable cause. Agent Dana MacDonald, who oversaw the search of Mew's residence, testified that the agents were informed prior to the search concerning previous criminal investigations of IBI and ADR. The government thus suggests that the incriminating nature of these documents was "immediately apparent" to the executing agents, in conformance with Horton 's requirements. It appears eighteen such documents were seized and offered into evidence.
 
 
 69
 We think this is a close question. See Arizona v. Hicks, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987). Just as the officer in Hicks could not, absent probable cause, upon glancing at a stereo, move it and look for a serial number, id. at 324-29, 107 S.Ct. at 1152-55, it may be argued that neither may an officer, upon glancing at a document noticeably beyond a search warrant, peruse it and look for incriminating evidence. As the D.C. Circuit observed in United States v. Heldt, a pre-Hicks case:
 
 
 70
 The incriminating character limitation necessarily permits a brief perusal of documents in plain view in order to determine whether probable cause exists for their seizure under the warrant. If in the course of that perusal, their otherwise incriminating character becomes obvious, they may be seized. Otherwise, the perusal must cease at the point at which the warrant's inapplicability to each document is clear.
 
 
 71
 668 F.2d 1238, 1267 (D.C.Cir.1981) (per curiam) (internal citations and parenthetical quotations omitted) (emphasis added), cert. denied, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982).
 
 
 72
 This is not a case in which the officers merely perused the documents to determine whether they fell within the scope of the search as specified by the search warrant; their immediate observation of the contested documents revealed that the documents fell outside the warrant. The government concedes the agents had to use their own discretion in perusing these papers to determine whether they were incriminating. As the Supreme Court observed in Andresen v. Maryland, 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n. 11, 49 L.Ed.2d 627 (1976):
 
 
 73
 [T]here are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.... [R]esponsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.
 
 
 74
 This court, in United States v. Issacs, 708 F.2d 1365 (9th Cir.), cert. denied, 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983), upheld an officer's perusal of a ledger "in no more thorough a manner than necessary to determine whether it contained the items which were the object of the search warrant," id. at 1369, stating in summary:
 
 
 75
 These cases make clear that when conditions justify an agent in examining a ledger, notebook, journal, or similar item, he or she may briefly peruse writing contained therein. The justification may arise from a reasonable suspicion to believe that the discovered item is evidence ...; or it may arise from the authority conferred by a warrant to search for certain items which might reasonably be expected to be found within such a book, as here. In either case, the plain view doctrine would permit brief perusal of the book's contents and, consequently, its seizure if such perusal gives the examining agent probable cause to believe that the book constitutes evidence.
 
 
 76
 We do not mean to suggest that agents entitled to examine a book or similar item may minutely scrutinize its contents, especially when personal, nonbusiness papers are involved. But this case does not require us to explore the limits to brief perusal. The trial court's factual findings establish that no more than a glance was necessary to ascertain the incriminating nature of the notations.
 
 
 77
 Id. at 1370 (internal citations and quotations omitted).
 
 
 78
 In the present case, we are troubled by the fact that, although the warrant limited the search to records post-dating May 1992 and pertaining to the Unity House fraud, the agents nonetheless seized documents beyond the scope of the warrant. It would have been readily apparent to the government agents that the documents seized pre-dated May 1992. In examining these documents, therefore, the agents were immediately alerted to the fact that the documents were beyond the warrant's scope. More difficult is the question of whether these documents were on their face incriminatory. Compare United States v. Menon, 24 F.3d 550, 559-61 (3d Cir.1994) (upholding plain view seizure of documents beyond warrant where seizing agents' collective knowledge gave them probable cause to believe trigger words such as "Jabeco," the name of a company with which defendant allegedly engaged in criminal activity, and "reprocessing" indicated that the documents evidenced illegal activity), with United States v. Soussi, 29 F.3d 565, 572 (10th Cir.1994) (permitting cursory review of documents pre-dating warrant by ten months, but remanding for factual finding to determine whether the incriminating character of the documents was "immediately apparent during the cursory review"); and United States v. Hinckley, 672 F.2d 115, 132 (D.C.Cir.1982) (per curiam) (rejecting argument that officer's observation, during lawful search for contraband, of piece of paper containing trigger words "prison," "life sentence," and "cooperation with the Justice Department," justified reading the entire document), overruled in part on other grounds, Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).
 
 
 79
 We assume arguendo that the searches for and seizures of these eighteen documents were not justified by the plain view doctrine, and therefore that they were illegally seized. This evidence was only material, however, to the testimony of Norman Frank and Brian Ajifu, as it pertained to Mew's prior fraudulent schemes. As we have held that this evidence was properly received under Fed.R.Evid. 404(b), we also note that the trial involving all of the defendants lasted for over one month. The other documentary and testimonial evidence pertaining to the Unity House fraud, including that implicating Mew, was overwhelming. The evidence pertaining to Mew's prior involvement with IBI, ADR, Norman Frank, and Brian Ajifu was de minimis in comparison to the evidence directly relevant to the particular offenses for which the defendants were tried.
 
 
 80
 We therefore find, even assuming that Mew's Fourth Amendment rights were violated, that the evidence admitted as a result of the illegal search was not harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).[12] See Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).CONCLUSION
 
 
 81
 The judgment of conviction of each of the defendants and the sentencing of the district court are AFFIRMED.
 
 
 
 *
 Judge Leavy has voted to reject the suggestion for rehearing en banc, and Judges Lay and Wright have so recommended
 
 
 *
 Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The government maintains that the very notion of a "prime bank note" transaction is fictitious
 
 
 [2]
 Gonzales too was convicted, but he is not a party to this appeal
 
 
 [3]
 Andrews was sentenced to a 30-month term of imprisonment, to be followed by a three-year term of supervised release. As a condition of his supervised release, the court ordered him to make restitution to Unity House in the amount of $10 million. Pursuant to the plea agreement, the court dismissed the remaining charges against Andrews
 
 
 [4]
 Mew received a sentence of 236-months imprisonment, Kim received a sentence of 189-months imprisonment, and Rude received a sentence of 135-months imprisonment, each to be followed by a three-year term of supervised release. Like Andrews, the other defendants were ordered to pay restitution of $10 million to Unity House
 
 
 [5]
 Each of the parties relies on Fed. R.App. P. 28(i) and adopts by reference the claims in one another's briefs. To avoid confusion, we discuss the claims as if they are applicable to all three defendants, except where otherwise noted
 
 
 [6]
 The government asserts that the defendants failed to object to the instructions at the time of the trial, as required by Fed.R.Crim.P. 30. Rude concedes that he did not object, and we can find no objection by Mew. Kim, however, asserts that a number of objections were timely made and that all defendants joined in the objections. Notwithstanding the dispute over whether the defendants properly objected (and our reading of the transcript verifies that the defendants failed properly to object to most of the instructions contested on appeal), we nonetheless have reviewed these instructions and find no prejudicial error
 
 
 [7]
 The government maintains that the defendants made no objection, but the defendants note that they objected twice during opening statement, once during trial, and once during closing argument. They also note that objections or motions raised by one defendant were automatically joined by the others
 
 
 [8]
 The dictionary defines "scam" as "a fraudulent or deceptive act or operation." Webster's Ninth New Collegiate Dictionary 1047 (1984). It defines "charlatan" as "one making usu. showy pretenses to knowledge or ability: FRAUD, FAKER." Id. at 228. These are just the kinds of fraudulent acts the government indicted and proved
 
 
 [9]
 The defendants also argue that the government repeatedly referred to gambling, in violation of the court's pre-trial orders. The court ruled such statements admissible, however, provided the government could tie the fraud proceeds to gambling. Viewed in the light most favorable to the government, the evidence supports the allegation that the proceeds were tied to gambling
 
 
 [10]
 Defendants also claim that the United States engaged in improper vouching by presenting two pie charts to the jury which demonstrated the disposition of the fraud proceeds. This court has recognized, however, that the government may, in a fraud case, prove that the defendants did not use the funds obtained for their intended purpose. See United States v. Brutzman, 731 F.2d 1449, 1452 (9th Cir.1984) ("The misuse of the funds directly established the fraudulent nature of the scheme."). A different result is not required simply because the government used pie charts to this end
 
 
 [11]
 As earlier explained, the parties have attempted to incorporate by reference the arguments in each other's briefs. Neither Rude nor Kim, however, has standing to challenge the search of Mew's residence. Conversely, Mew lacks standing to challenge the search of any other defendant's residence
 
 
 [12]
 In Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 1721-22, 123 L.Ed.2d 353 (1993), the Supreme Court for the first time rejected the harmless error rule of Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), in collateral attack cases involving constitutional trial error. The Brecht Court held that, where there is constitutional trial error, the petitioner must show actual prejudice under the " 'substantial and injurious effect' " rule in order to obtain a reversal. 507 U.S. at 637, 113 S.Ct. at 1721-22 (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). In other words, the petitioner may no longer succeed by showing a mere reasonable possibility of prejudice. Id. Until Brecht was decided, however, the Court had regularly applied the Chapman rule to constitutional trial error in collateral attack cases. See, e.g., Rose v. Clark, 478 U.S. 570, 576-77, 106 S.Ct. 3101, 3105-06, 92 L.Ed.2d 460 (1986); Chambers v. Maroney, 399 U.S. 42, 52-53, 90 S.Ct. 1975, 1981-82, 26 L.Ed.2d 419 (1970). The standard applied in the latter cases now appears to be overruled by the Brecht decision. Until the Brecht decision, the Kotteakos standard, grounded in the federal harmless error rule under 28 U.S.C. § 2111, had been limited to trial error of non-constitutional questions. Although there is language in the Brecht case, see 507 U.S. at 631 n. 7, 113 S.Ct. at 1718 n. 7, which indicates that § 2111 is more amenable to the harmless error review of constitutional violations, we know of no case which substitutes the Brecht rule of actual prejudice for the less stringent rule of Chapman on direct appeal