OPINION
 

 ALARCÓN, Circuit Judge.
 

 In this civil enforcement action filed by the Securities and Exchange Commission pursuant to Sections 20(d)(1) and 22(a) of the Securities Act of 1933, 15 U.S.C. §§ 77t(d)(1), 77v(a), and Sections 21(d)(3)(A), 21(e), and 27 of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78u(d)(3)(A), 78u(e), 78aa, (collectively “Securities Acts”), the district court entered judgment against Paul S. Rubera for violation of the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. 15 U.S.C. §§ 77e(a), (e). The district court entered judgment in favor of Mr. Rubera on the second and third claims of the complaint which alleged that Mr. Rubera used interstate commerce in the offer or sale of securities for purposes of committing fraud in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder. 17 C.F.R. § 240.10b-5. Each party has appealed.
 

 Mr. Rubera seeks reversal of the judgment that he violated the registration provisions of the Securities Acts. He contends that the district court erred as a matter of law in determining that his pay telephone investment program, in which individuals were sold pay telephones and service agreements in one transaction, was a “security,” and that he violated federal securities law by not registering his telephone investment program with the SEC.
 

 
 *1035
 
 The SEC argues that the district court erred in finding that Mr. Rubera lacked scienter with regard to the false and misleading statements made to persons who purchased pay telephones and service agreements from Alpha Telcom, Inc. (“Alpha”), Mr. Rubera’s solely owned corporation.
 

 We affirm because we conclude that Mr. Rubera’s telephone investment program was a “security” under the Securities Acts. We also hold that the district court’s finding that Mr. Rubera lacked scienter as to false statements made to investors was not clearly erroneous.
 

 We will analyze the merits of these appeals in separate parts. In Part One we consider whether the pay telephone investment program was a security under the Securities Acts. In Part Two we review the district court’s finding that the SEC failed to meet its burden to demonstrate that Mr. Rubera acted with scienter.
 

 Part One
 

 I
 

 In 1986, Mr. Rubera and a friend incorporated Alpha. Alpha was in the business of selling, installing, and maintaining pay telephones and business systems. Mr. Rubera became the sole owner of Alpha in 1989.
 

 In 1997, Charles Tummino approached Mr. Rubera with a business proposal for selling pay telephones to individuals and simultaneously entering into service agreements with those individuals to install, service, and maintain the telephones (“telephone investment program”). Dan Lacy, Alpha’s attorney, concluded that this proposal would not constitute a security. Mr. Lacy obtained an opinion from an outside attorney specializing in securities law who also opined that the proposal would not constitute a security. Thereafter, Alpha commenced selling telephones along with service contracts to individual investors. The telephone investment program was never registered with the SEC.
 

 The telephone investment program functioned in the following manner: Investors would purchase a telephone for $5,000 from Alpha or its affiliates and, at the same time, enter into a service agreement with Alpha whereby the latter would manage and maintain the telephone. Sales agents promoted the two agreements together as a package. Alpha offered four levels of service with the service agreements. Although investors were not obligated to select Alpha to manage their telephones, approximately 90 percent of investors selected Level Four, the highest level of service, while the remaining 10 percent selected Levels One, Two, or Three. Under Level Four, investors were passive, leaving operation of the telephones solely in Alpha’s hands. Alpha selected the location of the telephones, installed the telephones, maintained the telephones, paid all monthly telephone and utility bills, and obtained all regulatory certifications. Also, with Level Four, investors were given a buyback option allowing them to resell their telephones to Alpha at the purchase price for an indefinite period of time. In exchange, Alpha was entitled to a 70 percent share of any revenue received from the pay telephones. Under the Level Four service agreement, the investor was entitled to receive the balance. If, however, 30 percent of the telephone’s monthly revenue was not equal to or greater than a base amount set at $58.34, or approximately an annualized return of 14 percent on the $5,000 investment, Alpha agreed to waive a sufficient portion of its 70 percent share to meet the base amount.
 

 Mr. Tummino oversaw marketing and sales for the telephone investment pro
 
 *1036
 
 gram. He created the marketing materials, supervised the sales agents, and prepared the sales and service agreements. In October 1998, Mr. Rubera created American Telecommunications Company, Inc. (“ATC”) as a wholly owned subsidiary of Alpha to be the marketing and sales arm of the telephone investment program.
 

 In the same year, Mr. Rubera retained Perkins & Co., an accounting firm, to review Alpha’s financial statements. Perkins & Co. concluded that under Generally Accepted Accounting Principles (“GAAP”), Alpha could not categorize the sale of telephones to investors as revenue due to the buyback options. Applying GAAP and treating the telephone sales as liabilities, Alpha’s financial status as of October 31, 1998 would have reflected a net loss of approximately $2,600,000 rather than a marginal net gain. Mr. Rubera did not believe the telephone sales should be considered liabilities since he reported them as income for tax purposes. He decided instead to treat telephone sales as revenue in Alpha’s financial report, and to insert a note in the report stating that its methodology departed from GAAP.
 

 In late 1998, Mr. Tummino retired and introduced Mr. Lacy and Mr. Rubera to Ross Rambach and Mark Kennison who operated Strategic Partnership Alliance, LLC (“SPA”). SPA supervised and trained sales agents in marketing pay telephones to investors. Mr. Rubera hired SPA to oversee hiring, training, and supervision of sales agents for the telephone investment program.
 

 Mr. Rambach suggested that Mr. Rub-era hire a company named ATMN/EMI to acquire new pay telephone sites. Later, Mr. Rubera learned that Mr. Rambach and Mr. Kennison were ATMN/EMI’s principals and that the sites they acquired were oftentimes unsuitable for pay telephone use or were nonexistent. Alpha terminated its relationship with ATMN/ EMI when it discovered these problems.
 

 In early 2000, Mr. Rambach and Mr. Kennison persuaded Mr. Rubera to acquire an insurance policy to guarantee the availability of funds to finance the buyback option. They introduced Mr. Rubera to Robert Harrison, a Texas-based insurance agent with whom they were familiar. Mr. Harrison created Northern & Western Insurance Company (“N & W”) to insure the buyback claims, with Mr. Rubera as a cosignatory. ATC paid significant premiums to Mr. Harrison to supply excess insurance. Mr. Harrison led the parties to believe that Lloyd’s of London was the excess insurer, a falsity which was advertised in the marketing materials. Once this mistake was discovered, Alpha sent a letter to investors informing them that Lloyd’s of London was not the excess insurer.
 

 Meanwhile, SPA agents encouraged investors who had bought telephones before buyback insurance was offered to exercise their buyback options and then repurchase telephones with SPA. In this way, investors would, at no cost to themselves, acquire telephones that carried buyback insurance. By April 2001, there was a sharp increase in investor buyback requests. This resulted in extra sales commissions for SPA and financial losses for ATC- and Alpha.
 

 Throughout this time, Mr. Rubera did not pay investors in accordance with the revenue generated from their pay telephones, but instead paid all investors at least $58.34 a month, regardless of the amount of revenue generated by each telephone. To fund these monthly payments to investors, Alpha borrowed from ATC. Mr. Rubera thus paid existing investors from funds ATC had obtained from telephone sales to new investors.
 

 
 *1037
 
 The pay telephone business was not profitable. Most of Alpha’s revenue derived from telephone sales. The sales materials, however, stated that pay telephones produce substantial profits. One of ATC’s sales brochures stated that the telephone investments were low risk and “virtually recession-proof,” guaranteed an annual return of 14 percent to be paid monthly, and claimed that the telephone business overall was highly profitable (“ATC sales brochure”). It is unclear from the record who compiled the ATC sales brochure. By August 2001, Alpha was operating at a significant loss and filed for bankruptcy.
 

 On August 27, 2001, the SEC filed its complaint in the United States District Court for the District of Oregon. It alleged that Alpha and Mr. Rubera, along with other named defendants, violated the securities registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933, and the antifraud provisions of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities and Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.
 

 After granting the SEC’s ex parte motion for a temporary restraining order and motion for a preliminary injunction against Alpha and Mr. Rubera, the district court held a bench trial on November 14, 2001 and December 18, 2001.
 

 In its order issued on February 7, 2002, the district court held that Alpha’s telephone program was an investment contract under the standard set forth in
 
 SEC v. W.J. Howey Co.,
 
 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), and was therefore subject to regulation under federal securities law.
 
 SEC v. Alpha Telcom, Inc.,
 
 187 F.Supp.2d 1250, 1258 (D.Or.2002). Because Mr. Rubera had not registered the telephone investment program, the district court determined that he had violated federal securities law. The district court enjoined Mr. Rubera from committing future securities violations, and ordered Mr. Rub-era to disgorge profits in the amount of $3,750,707.66. As to the SEC’s securities fraud claim, the district court found that the SEC failed to prove that Mr. Rubera acted with scienter, and declined to impose civil penalties against Mr. Rubera.
 

 II
 

 Mr. Rubera contends that the district court erred in holding that the telephone investment program was a “security” within the meaning of the Securities Acts. We review de novo a district court’s determination that a transaction is a “security” for purposes of federal securities law.
 
 Hocking v. Dubois,
 
 885 F.2d 1449, 1454 (9th Cir.1989);
 
 SEC v. Goldfield Deep Mines, Co.,
 
 758 F.2d 459, 463 (9th Cir. 1985).
 

 To establish a claim for violation of federal securities law, it is necessary to show that the violation involved a “security” as defined by the Securities Acts.
 
 Mason v. Unkeless,
 
 618 F.2d 597, 598-99 (9th Cir.1980);
 
 Smith v. Gross,
 
 604 F.2d 639, 641 (9th Cir.1979). The Supreme Court has recognized that Congress intended that the Securities Acts be read liberally: “Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of ‘countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.’ ”
 
 Reves v. Ernst & Young,
 
 494 U.S. 56, 60-61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (quoting
 
 Howey,
 
 328 U.S. at 299, 66 S.Ct. 1100). Hence, the determination whether or not a transaction falls within the ambit of the Securities Acts is not bound by legal formalisms, but instead focuses on the economic realities involved in the transaction.
 
 Tcherepnin v. Knight,
 
 389 U.S. 332, 336,
 
 *1038
 
 88 S.Ct. 548, 19 L.Ed.2d 564 (1967);
 
 Howey,
 
 328 U.S. at 298, 66 S.Ct. 1100.
 

 In this spirit, Congress did not intend the definition of “security” in the Securities Acts to be restrictive. Rather, it defined “security” sufficiently broadly to encompass virtually any instrument that might be sold as an investment.
 
 Reves,
 
 494 U.S. at 61, 110 S.Ct. 945;
 
 United Hous. Found., Inc. v. Forman,
 
 421 U.S. 837, 847-48, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). The Court has stressed, in delineating the scope of the Securities Acts’ regulatory domain, that the term “security,” as used in the Securities Act of 1933, has virtually the same meaning and coverage as “security” in the Securities Exchange Act of 1934.
 
 Reves,
 
 494 U.S. at 61 n. 1, 110 S.Ct. 945;
 
 Forman,
 
 421 U.S. at 847 n. 12, 95 S.Ct. 2051.
 

 The Securities Acts define “security” as, among other things, an “investment contract.”
 
 See
 
 15 U.S.C. §§ 77b(a)(1), 78c(a)(10) (2003). The Supreme Court in
 
 Howey
 
 held that, for purposes of the Securities Acts, the term “investment contract” retains the same meaning it possessed under predating state “blue sky” laws. The Court defined “investment contract” as any “contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party.”
 
 Id.
 
 at 298-99, 66 S.Ct. 1100. We have distilled
 
 Howey’s
 
 definition into a three-part test requiring “(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others.”
 
 SEC v. R.G. Reynolds Enters., Inc.,
 
 952 F.2d 1125, 1130 (9th Cir.1991).
 

 Mr. Rubera concedes that his telephone investment program meets the second element of the
 
 Howey
 
 test, common enterprise. He contends, however, that the district court erred in determining that the first and third parts of the
 
 Howey
 
 test were satisfied.
 

 A.
 

 We have stated that
 
 Howey’s
 
 “investment of money” prong requires that the investor “commit his assets to the enterprise in such a manner as to subject himself to financial loss.”
 
 Hector v. Wiens,
 
 533 F.2d 429, 432 (9th Cir.1976) (citing
 
 El Khadem v. Equity Sec. Corp.,
 
 494 F.2d 1224 (9th Cir.1974));
 
 accord SEC v. Pinckney,
 
 923 F.Supp. 76, 80 (E.D.N.C. 1996);
 
 One-O-One Enter., Inc. v. Caruso,
 
 668 F.Supp. 693, 700 (D.D.C.1987).
 

 Here, the investors in the telephone investment program turned over substantial amounts of money to Alpha with the hope that Alpha’s management of the pay telephones would yield financial gains. In doing so, the investors incurred a risk that their individual pay telephones would not return a profit, or that the enterprise as a whole would fail. Although the telephone investment program included a buyback option, there was no guarantee that Alpha would be financially able to honor buyback requests at the time investors demanded them. In fact, as it turned out, this eventuality came to pass as Alpha became financially unable to repurchase all the pay telephones. Further, whether the majority of investors in the telephone investment program actually suffered a monetary loss is immaterial so long as there existed the risk of loss.
 
 See Hector,
 
 533 F.2d at 432-33. By purchasing pay telephones and service contracts from Alpha, therefore, investors in the telephone investment program subjected themselves to financial loss.
 

 Mr. Rubera attempts to remove the telephone investment program from the ambit of the Securities Acts by dividing the scheme into two separate transactions: a
 
 *1039
 
 purchase of assets (the pay telephones) and an agreement to service the pay telephones. Mr. Rubera asserts that the money investors paid Alpha to service and maintain the telephones was a business expense, not an investment.
 

 Both the Supreme Court and Ninth Circuit have previously rejected similar attempts to avoid federal securities law liability by characterizing an investment as a series of discrete transactions.
 
 Howey
 
 involved an investment scheme in which investors were offered a contract to purchase a portion of an orange grove, together with a service contract in which the defendants agreed to maintain and harvest the orange grove plot for the investor. 328 U.S. at 295-96, 66 S.Ct. 1100. Investors were individuals who lacked the knowledge or resources for orange cultivation and harvesting. They were attracted to the investment opportunity by the defendants’ promise of high annual returns.
 
 Id.
 
 at 296, 66 S.Ct. 1100.
 

 The Court disapproved of the notion that the defendants were offering nothing more than land in fee simple along with management services. The defendants, the Court stated, were “offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise.”
 
 Id.
 
 at 299, 66 S.Ct. 1100. The investors in the investment opportunity had “no desire to occupy the land or to develop it themselves,” but rather were “attracted solely by the prospects of a return on their investment.”
 
 Id.
 
 at 300, 66 S.Ct. 1100. The Court held that the defendants’ investment opportunity therefore satisfied the “essential ingredients” of an investment contract.
 
 Id.
 
 at 301, 66 S.Ct. 1100.
 

 In
 
 Hocking,
 
 relying on
 
 Howey,
 
 we stated that an investment package offering a contract to purchase a condominium along with a service agreement to maintain and rent out the condominium could not be pulled apart into separate transactions. 885 F.2d at 1458. We reasoned that the defendants’ investment scheme did not involve a situation in which individuals who already owned the condominiums had independently sought service agreements with the defendants. We held that because the investors had purchased the condominiums and service agreements as a package, the scheme satisfied the “investment of money” prong of the
 
 Howey
 
 test.
 
 Id.
 
 at 1459.
 

 Here, as in
 
 Howey
 
 and
 
 Hocking,
 
 investors did not purchase pay telephones independently of the service agreements. Instead, the telephone purchase contracts and the service agreements were marketed and sold to investors as a package. The investors lacked the knowledge and resources to service and maintain the telephones themselves. Predictably, the vast majority chose the highest level of service available. Their motivation for entering into Mr. Rubera’s telephone investment program was not personal use, but rather personal gain — they sought to share in the profits they expected would be generated by the telephones. We are persuaded that the district court correctly determined that the telephone investment program satisfied
 
 Howey’s
 
 “investment of money” prong.
 

 B.
 

 The third prong of the
 
 Howey
 
 test for determining whether a transaction qualifies as an “investment contract” requires that the investor be “led to expect profits solely from the efforts of the promoter or a third party.”
 
 Howey,
 
 328 U.S. at 299, 66 S.Ct. 1100. We have rejected a strict interpretation of this prong in favor of a more flexible focus on “whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which
 
 *1040
 
 affect the failure or success of the enterprise.”
 
 SEC v. Glenn W. Turner Enters.,
 
 474 F.2d 476, 482 (9th Cir.1973);
 
 accord Webster v. Omnitrition Int’l, Inc.,
 
 79 F.3d 776, 784 (9th Cir.1996);
 
 Reynolds,
 
 952 F.2d at 1131.
 

 The investors in Mr. Rubera’s telephone investment program were passive, completely relying on Alpha to select a suitable location for the telephone, install the pay telephone, maintain the telephone, pay all monthly telephone and utility bills, as well as obtain all regulatory certifications. These functions were all crucial to the profitability of the investments in the pay telephones, and, concomitantly, to the success of the investment program as a whole. The entire scheme hinged on Alpha’s efforts, managerial skill, and — as became evident at the time of Alpha’s demise. — continued solvency. Therefore, the telephone investment program appears to satisfy the “expectation of profits” prong.
 

 Mr. Rubera argues, however, that
 
 Howey’s
 
 “expectation of profits” prong is not met since the investors were contractually assured of receiving a minimum monthly payment. In support, Mr. Rubera relies on
 
 SEC v. Life Partners, Inc.,
 
 87 F.3d 586 (D.C.Cir.1996), and
 
 SEC v. ETS Payphones, Inc.,
 
 300 F.3d 1281 (11th Cir.2002),
 
 cert. granted sub nom. SEC v. Edwards,
 
 — U.S.-, 123 S.Ct. 1788, 155 L.Ed.2d 665 (2003).
 

 Life Partners
 
 in inapposite. There, investors were sold viatical settlements: contracts in which investors acquired the right to collect on the life insurance policies of terminally ill individuals.
 
 Life Partners,
 
 87 F.3d at 537. The court held that the sale of life insurance policies to investors did not meet the “expectation of profits” prong because the defendants’ post-transaction ministerial functions had no impact on investor profits.
 
 Id.
 
 at 546. Here, the investors’ profits depended on Alpha’s expertise and care. Unlike the insurance policies at issue in
 
 Life PaH-ners,
 
 the telephones required service and expert management to generate returns for investors.
 

 The transactions at issue in
 
 ETS Payphones
 
 were similar to the telephone investment program. There, the defendants sold pay telephones to investors, who, in the same transaction, would “lease” the telephones back to the defendants in exchange for a fixed monthly fee. The defendants would then manage the telephones and generate revenue from them. If at any time an investor was dissatisfied, he or she could require the defendants to buy back the telephones.
 

 While the court determined that the scheme satisfied
 
 Howey’s
 
 first and second prongs, the Eleventh Circuit held that the “expectation of profits” prong was not satisfied since investors’ returns were not derived from the efforts of the defendants. Instead, the investors’ profits were derived through the benefit of their bargain with the defendants since the returns were contractually guaranteed. 300 F.3d at 1285. “Because the investors received a fixed monthly sum,” the court said, “the actual earnings of their telephone, or ETS, were irrelevant.”
 
 Id.
 
 The court held that since the telephone scheme did not fulfill the elements of the
 
 Howey
 
 test, the district court lacked subject-matter jurisdiction over the action.
 
 Id.
 

 The holding in
 
 ETS Payphones
 
 is inconsistent with our precedent. In
 
 United States v. Carman, 577
 
 F.2d 556 (9th Cir. 1978), the defendant, the owner of several vocational training schools, sold student promissory notes to financial institutions together with servicing agreements for the notes. The court rejected the defendant’s contention that the investors’ profits did not depend on his efforts because their returns were set at a fixed rate and in
 
 *1041
 
 sured. We reasoned that the defendant’s argument ignored the fact that the service agreements “placed investors in a totally passive role,” and that the investors’ avoidance of loss “was clearly dependent upon the sound management and continued solvency” of the defendant’s vocational schools.
 
 Id.
 
 at 563. “This risk of
 
 loss,”
 
 the court held, “is sufficient to bring the transaction within the meaning of a security, even where the anticipated financial gain is fixed.”
 
 Id.
 
 (emphasis in original);
 
 accord SEC v. Infinity Group Co.,
 
 212 F.3d 180, 189 (3d Cir.2000) (stating that the mere fact that the expected rate of return is not speculative does not render
 
 Howey
 
 inapplicable).
 

 Unlike the factual scenario in
 
 ETS Payphones,
 
 Mr. Rubera’s telephone investment program did not involve a fixed rate of return. Although Mr. Rubera chose to pay each investor $58.34 a month, the terms of the Level Four service agreement provided that an investor would receive 30 percent of his or her pay telephone’s total monthly revenue. Thus, depending on the degree of effort and skill Alpha employed in servicing the telephones, an investor could potentially realize a return greater than $58.34 a month.
 

 Mr. Rubera further contends that
 
 How-ey
 
 ’s third prong is not met because the investors retained the ability to manage and control the telephones thereby making Alpha’s managerial skills and effort nonessential to the success of the program. Mr. Rubera asserts that the option of self-control was not illusory since 10 percent of the investors did not select Level Four.
 

 We have previously noted that “the question of an investor’s control over his investment is decided in terms of practical as well as legal ability to control.”
 
 Hocking,
 
 885 F.2d at 1460. The degree of experience and knowledge of the investor and the promoter’s managerial skill are relevant to determining practical ability to control.
 
 Id.
 
 (citing
 
 Williamson v. Tucker,
 
 645 F.2d 404, 424 (5th Cir.1981)).
 

 Here the evidence is undisputed that the investors were passive, relying on Alpha to manage their telephones. Sales agents promoted the investment opportunity in part by highlighting Alpha’s experience and skill in the telecommunications industry. Moreover, although a small fraction of investors did not choose Level Four, all investors in the telephone investment program entered into some sort of service agreement with Alpha, with the vast majority opting for the highest level of service. Therefore, it is clear that investors relied on Alpha’s managerial skill and effort to make the telephone investment program a success. Accordingly,
 
 Howey’s
 
 “expectation of profits” prong is satisfied in this case.
 

 The district court properly determined that Mr. Rubera violated the Securities Acts by not registering the telephone investment program with the SEC.
 

 Part Two
 

 The SEC contends in its appeal that the district court clearly erred in finding that Mr. Rubera lacked scienter as to the false and misleading statements the sales agents made to investors in promoting the telephone investment program. A district court’s findings of fact may be reversed only if they are clearly erroneous. Fed.R.Civ.P. 52(a);
 
 Anderson v. Bessemer City,
 
 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Under the clearly erroneous standard, we defer to the lower court’s determination unless, based on the entire evidence, we are possessed of a “definite and firm conviction that a mistake has been committed.”
 
 Easley v. Cromartie,
 
 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001). So long as the district court’s view of the evidence is plau
 
 *1042
 
 sible in light of the record viewed in its entirety, it cannot be clearly erroneous, even if the reviewing court would have weighed the evidence differently had it sat as the trier of fact.
 
 Anderson,
 
 470 U.S. at 573-74, 105 S.Ct. 1504;
 
 Husain v. Olympic Airways,
 
 316 F.3d 829, 835 (9th Cir. 2002). Furthermore, in reviewing a district court’s findings of fact for clear error, we must view the evidence in the light most favorable to the prevailing party.
 
 Lozier v. Auto Owners Ins. Co.,
 
 951 F.2d 251, 253 (9th Cir.1991).
 

 Section 17(a)(1) of the Securities Act, Section 10(b) of the Securities and Exchange Act, and Rule 10b-5
 
 [1]
 
 prohibit fraudulent conduct or practices in connection with the offer or sale of securities, including making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce.
 
 SEC v. Dain Rauscher, Inc.,
 
 254 F.3d 852, 856 (9th Cir.2001). A showing of scienter is an element of an enforcement action pursuant to the antifraud provisions of the Securities Acts.
 
 Aaron v. SEC,
 
 446 U.S. 680, 701-02, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Scienter is “a mental state embracing intent to deceive, manipulate, or defraud.”
 
 Ernst & Ernst v. Hochfelder,
 
 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).
 

 Scienter may be established by recklessness, defined as
 

 a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.
 

 Hollinger v. Titan Capital Corp.,
 
 914 F.2d 1564, 1569 (9th Cir.1990) (en banc) (quoting
 
 Sundstrand Corp. v. Sun Chem. Corp.,
 
 553 F.2d 1033, 1045 (7th Cir.1977)). Reckless conduct must be something more egregious than even “white heart/empty head” good faith and represents an extreme departure from the standards of ordinary care such that the defendant must have been aware of it.
 
 Id.
 
 at 1570. Recklessness satisfies the scienter requirement only “to the extent that it reflects some degree of intentional or conscious
 
 *1043
 
 misconduct.”
 
 In re Silicon Graphics Inc. Sec. Litig.,
 
 183 F.3d 970, 977 (9th Cir. 1999).
 

 The SEC contends that the district court ignored overwhelming evidence demonstrating that Mr. Rubera acted with scienter with regard to representations sales agents made to investors that the telephone investment program was “virtually recession proof,” guaranteed a 14 percent annual return, was insured and highly profitable, and that Mr. Rubera knew these statements were false or misleading at the time sales agents made them.
 

 In so contending, the SEC relies principally on the deposition testimony of David Gene Winstead and Chris Clapp, former general managers of Alpha. They testified that Mr. Rubera participated in company meetings at least once a week, and spoke on a daily basis with them regarding operations matters and with others in the company in charge of preparing financial reports. The SEC argues that this testimony demonstrates that Mr. Rubera managed Alpha closely, and knew that it was in poor financial condition and that the telephone investment program was uninsured.
 

 Furthermore, the SEC asserts that the evidence shows that Mr. Rubera knew that the sales materials were false or misleading. Mr. Winstead stated that Mr. Rubera reviewed purchase agreements and service agreements, and that sometime in 1998, Mr. Rubera asked Mr. Winstead to review a maroon sales brochure similar to if not the same as the ATC sales brochure. The SEC also points to the fact that Mr. Rub-era paid investors an annualized return of 14 percent, regardless of the profitability of their telephones, using funds from new telephone sales.
 

 In relying on this testimony, however, the SEC ignores the evidence presented by Mr. Rubera to demonstrate that he lacked scienter. There is evidence in the record, credited by the district court, to support an inference that Mr. Rubera was an unsophisticated businessman who managed Alpha from a distance, delegated decision making to others, and simply did not comprehend his company’s poor financial condition. Mr. Winstead alleged in his affidavit that it was he, not Mr. Rubera, who managed the day-to-day activities of Alpha. He also alleged that Mr. Rubera believed Alpha was an expanding and profitable business. Other witnesses testified that Mr. Rubera tended to value friendship and loyalty over skill in managing Alpha. The evidence shows that Mr. Rubera hired people he had met at the local grocery store, and during his days as a volunteer fireman. Witnesses presented by Mr. Rubera asserted that he did not believe that telephone sales should be treated as liabilities because the buyback options were rarely invoked and the telephone sales were reported as income to the IRS. The district court also heard evidence that once Mr. Rubera realized Alpha was experiencing serious cash flow problems, he took no significant withdrawals from Alpha in the form of loans or compensation, sold his cars and put the money into Alpha, took an outside loan in the amount of $250,000 to bolster Alpha’s financial condition, and laid off employees in an attempt to reduce expenses.
 

 There is also evidence in the record that Mr. Rubera did not know of the sales agents’ misstatements to investors. Mr. Winstead alleged in his affidavit that he did not approve or know of the statements in the ATC sales brochure assuring investors a 14 percent annual return, and to his knowledge Mr. Rubera did not approve or know of these statements either. According to Mr. Winstead, Mr. Tummino and SPA were responsible for all sales materials connected with the telephone invest
 
 *1044
 
 ment program. Mr. Rambach testified that Mr. Lacy was the person he contacted at ATC for reviewing sales materials. Mr. Rambach stated that he was not aware that Mr. Rubera approved any of the sales materials.
 

 Much of the evidence submitted by Mr. Rubera is rife with hearsay and conclusory statements, and it appears that the district court relied on this evidence. During oral argument, the SEC asserted that it timely filed written evidentiary objections to Mr. Rubera’s evidence based on hearsay and lack of personal knowledge grounds. The district court, however, did not rule on these objections. There is no indication in the record that the SEC requested a ruling on its objections from the district court. Furthermore, the SEC has not challenged the admissibility of Mr. Rub-era’s evidence.
 
 See Miller v. Fairchild Indus., Inc.,
 
 797 F.2d 727, 738 (9th Cir. 1986) (“The Court of Appeals will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant’s opening brief.”). Therefore, we decline to address the admissibility of the hearsay and conclusory statements offered by Mr. Rubera, or the propriety of the district court’s reliance on this evidence in making its findings of fact.
 

 In light of the evidence presented by Mr. Rubera to rebut the SEC’s claim that his statements to his investors were fraudulent, the district court’s factual determination that Mr. Rubera did not act intentionally or recklessly with regard to the false representations made to investors was, at a minimum, plausible. The district court could reasonably have found that Mr. Rubera was unaware of his business’s dire financial condition because he was a poor businessman who relied on his attorneys and others to make daily business decisions; and that he was unaware that the sales materials contained false or misleading statements.
 

 The fact that Mr. Rubera terminated Alpha’s relationship with ATMN/EMI upon learning that the telephone sites they acquired were oftentimes unsuitable for telephone use is inconsistent with the SEC’s assertion that Mr. Rubera believed that his business was a “Ponzi scheme.” Mr. Rubera’s efforts to provide additional funding to Alpha as it plunged into an abyss of debt also supports the district court’s findings.
 

 Finally, the evidence also supports the district court’s finding that Mr. Rubera did not know that the buyback options were uninsured. Mr. Harrison testified in his deposition that the buyback insurance was Mr. Kennison’s idea and that Mr. Rubera did not appear to understand how the buyback insurance functioned. Mr. Rubera also made several premium payments to Mr. Harrison and established a sinking fund to finance the buyback insurance. When Mr. Rubera learned that the buyback options were not insured by Lloyd’s of London, he sent a letter to investors informing them of the error. Later, as buyback requests soared, Mr. Rubera approved his employees’ attempts to lodge insurance claims with Mr. Harrison. The district court did not clearly err in concluding that these actions are not consistent with intentional or reckless deceit.
 

 The evidence in the record is sufficient to support an inference that Mr. Rubera made serious errors in managing his company and computing its worth, and that he was at best derelict in not controlling the sales agents’ representations to investors. We are not persuaded, however, that the district court’s finding provokes a “definite and firm conviction that a mistake has been committed.”
 
 Easley,
 
 532 U.S. at 242, 121 S.Ct. 1452.
 

 
 *1045
 
 CONCLUSION
 

 We hold that because the telephone investment program qualified as an “investment contract” under the three-part test set forth in
 
 Howey,
 
 the district court did not err in ruling that Mr. Rubera violated the registration provisions of the Securities Acts. We also conclude that the district court’s finding that the SEC did not meet its burden of proving that Mr. Rub-era acted with scienter was not clearly erroneous.
 

 AFFIRMED.
 

 [1]
 

 . Section 17(a) of the Securities Act of 1933, IS U.S.C. § 77q(a), forbids any person in the offer or sale of any securities by means of interstate commerce
 

 (1) to employ any device, scheme, or artifice to defraud, or
 

 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
 

 (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
 

 Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful for any person by means of interstate commerce “[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.”
 

 Mirroring Section 17(a), Rule 10b-5, 17 C.F.R. § 240.10b-5, provides that it shall be unlawful for any person
 

 (a) to employ any device, scheme, or artifice to defraud,
 

 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 

 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.