NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No.  CC-11-1323-KiDJu |
| DEAD OAK ESTATES, INC., | Bk. No.  08-28230-MM |
| Debtor. | Adv. No.  09-02730 |
| MICHAEL F. BURKART, Chapter 7 Trustee; SUSAN VINEYARD, | |
| Appellants, | |
| v. | **M E M O R A N D U M**[1] |
| ROBERT KUPKA; CYNTHIA KUPKA, | |
| Appellees. | |

Argued and Submitted on November 16, 2011
at Sacramento, California

Filed - December 16, 2011

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Honorable David E. Russell, Bankruptcy Judge, Presiding

_____

Appearances:     Kristen Ditlevsen, Esq. argued for appellants,
                 Michael F. Burkart and Susan Vineyard;
                 George C. Hollister, Esq. of the Hollister Law
                 Corporation argued for appellees, Robert Kupka and
                 Cynthia Kupka.

_____

Before: KIRSCHER, DUNN, and JURY, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8013-1.

Appellants, chapter 7[2] trustee Michael F. Burkart ("Trustee") and Susan Vineyard ("Vineyard")(collectively "Trustee"), appeal a bankruptcy court judgment in favor of defendants, appellees Robert Kupka ("Robert") and Cynthia Kupka ("Cynthia")(collectively "Defendants"), on Trustee's action for declaratory relief regarding debtor's rights under an option to purchase real property owned by Defendants.  We AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**A.    Prepetition Facts.**

Debtor, Dead Oak Estates, Inc. ("Dead Oak"), is a Delaware corporation originally incorporated on June 7, 1982.  Dead Oak's name was changed to Hangtown Leasing Company by amendment filed on July 11, 1986 ("Hangtown").  Dead Oak's name was changed back to Dead Oak Estates, Inc. by amendment filed on April 4, 2002.

Phil Sheridan ("Sheridan") owned and operated a small charter airline, Galaxy Airlines ("Galaxy"), located in Fort Lauderdale, Florida.  In January 1985, a Galaxy flight crashed in Reno, Nevada, killing 70 of the 71 persons on board.  Shortly after the crash, the U.S. Department of Transportation ("DOT") suspended Galaxy's operational certificate.  Sheridan's efforts to reinstate the operational certificate were unsuccessful, and he decided to sell Galaxy.

In 1987, Sheridan entered into a Stock Purchase Agreement

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure will be referred to as "FRCP."  The Federal Rules of Evidence will be referred to as "FRE."

("Agreement") transferring his 100% interest in Galaxy to John Kupka ("John") and John's assigns, in exchange for: a promissory note to Sheridan in the amount of $400,000, an agreement to pay Sheridan's debt to Cardinal Corporation in the amount of $900,000, and payment of Galaxy's 941 tax obligation to the IRS. John's "assigns" were Hangtown n/k/a Dead Oak, one of several corporations controlled by John through the Kupka Family Trust, and William and Tammy Tsui (collectively "buyers"). In October 1987, the buyers attempted to rescind the Agreement for, <u>inter alia</u>, Sheridan's failure to disclose the correct amount of the IRS's tax lien, and the buyer's inability to reinstate the operational certificate with the DOT.[3] Sheridan rejected the rescission notice.

In 1988, Sheridan sued the buyers in a Florida federal court for specific performance of the Agreement. While the suit was pending, Sheridan filed for chapter 7 bankruptcy. In August 1993, the Florida court entered a default judgment in favor of Donna Bumgardner, Sheridan's chapter 7 trustee, and Cardinal

---

[3] In January 1988, the DOT issued an Order to Show Cause ("OSC") tentatively revoking Galaxy's operational certificate for failing to comply with the continuing aviation fitness requirements. Prior to the OSC, John had submitted documentation to the DOT in an effort to get Galaxy's operational certificate reinstated, including an Option to Purchase Real Estate, dated November 10, 1986 (the "Option"). Also in the DOT's file submitted by John was a letter dated June 3, 1987, from John to Richard Taylor, attorney for Galaxy on the DOT matter, in which John stated that "the family trust has first option on the airport property for $1.8 [million]," and that Lodi Airport was worth "roughly $7.5 [million]," with total debt of "less than $1.2 [million]."

The DOT noted several reasons in the OSC for revoking Galaxy's operational certificate, including its apparent poor financial condition, John's "overstated" value of Lodi Airport, and John's prior criminal record for false swearing under oath.

Corporation (the third-party beneficiary to the Agreement) and against John, Hangtown, and the Tsuis (the "Sheridan Judgment"). In 1995, Marika Tolz succeeded Donna Bumgardner as trustee for Sheridan's estate. In 1996, the bankruptcy court approved trustee Tolz's employment of co-plaintiff Vineyard as collection agent for the Sheridan Judgment. In 2000, Vineyard filed a chapter 7 bankruptcy. John filed a chapter 7 bankruptcy in 2001. In 2001, Cardinal Corporation assigned its portion of the default judgment (about $1.4 million plus interest) to the trustee of Vineyard's bankruptcy estate. In 2003, the bankruptcy court entered an order approving the trustee's abandonment of Vineyard's estate's interest in the Sheridan Judgment back to Vineyard. After years of having no success in collecting on the Sheridan Judgment, in May 2005, trustee Tolz filed a notice of intent to abandon Sheridan's portion of the Sheridan Judgment (about $600,000 plus interest) back to Sheridan. In July 2005, Sheridan affirmed and assumed the assignment agreement between trustee Tolz and Vineyard for collection of the Sheridan Judgment.

**B.    Postpetition Facts.**

Vineyard filed an involuntary chapter 7 petition against Dead Oak on June 20, 2008. John is the principal of Dead Oak.[4] Upon no objection, an order for relief was entered in August 2008. Two proofs of claim were filed in Dead Oak's case, including a general unsecured claim by Vineyard for $5,955,000

---

[4] John, father to Robert and Cynthia, passed away during this case on October 5, 2010.

- 4 -

based in part on the Sheridan Judgment. On August 21, 2009, the bankruptcy court approved a compromise authorizing the joint prosecution (at Vineyard's expense) of the estate's Option to purchase real property owned by Defendants in Acampo, California, commonly known as Lodi Airport for $1.8 million, and providing for a division of any net recovery to Vineyard and the estate's other creditors. In September 2009, pursuant to an order based on Dead Oak's failure to file documents, Vineyard filed schedules and a statement of financial affairs on behalf of Dead Oak. In those documents, Vineyard identified the Option as property of the estate.

On November 11, 2009, Trustee filed a declaratory relief action against Defendants seeking a determination that Dead Oak's Option was valid. Attached to the complaint was a copy of the Option, dated November 10, 1986, which stated:

> The following is an option, with first right of refusal, given to Hangtown Leasing Company, a Delaware Corporation to purchase all that real property described in exhibit "A" attached, commonly known as Lodi Airport situated in Acampo, California. Option price is One million, eight hundred thousand dollars. ($1,800,000.00).

The Option reflected the signatures of Robert and Cynthia in their individual capacities as co-owners of Lodi Airport. Trustee alleged that Defendants never revoked the Option, and it did not limit Dead Oak's right to exercise it to any specific time period or describe a particular manner in which it must be exercised. Defendants disputed the validity of the Option, thus explaining Trustee's need for declaratory relief.

Defendants moved to dismiss Trustee's complaint on December 15, 2009. In their motion, Defendants denied knowing

- 5 -

about the unrecorded Option until Vineyard's counsel brought it to their attention in February 2008. Defendants denied ever agreeing to the Option and asserted that they had never received any payment with respect to or on account of it. The motion also referred to a letter sent by Defendants's counsel to Trustee on May 11, 2009. In the letter, attached to Robert's Declaration in support of the motion, counsel asserted that Robert's and Cynthia's signatures on the Option had been forged, and that the Option was never signed by either of them. Defendants's motion was denied on January 20, 2010. They filed an answer on February 2, 2010. Defendants subsequently filed two motions for summary judgment, both of which were denied.

Two days before trial, Trustee filed his trial brief and a motion in limine to exclude certain evidence of Defendants. In his brief, Trustee conceded that he was not convinced Cynthia personally signed the Option based on the opinions of the handwriting experts employed by both parties. However, contended Trustee, their expert's analysis of Cynthia's questioned signature was limited due to Defendants's unwillingness to produce known signature exemplars for her for the period from 1985 to 1990.[5] As for Robert's questioned signature, Trustee's expert concluded that it was probably genuine. Based on the expert's findings, Trustee contended that it was more probable than not that Robert signed both his own signature and Cynthia's

[5] The bankruptcy court subsequently found that Cynthia's questioned signature on the Option was not genuine. Appellants do not appeal that finding. We discuss Cynthia's testimony as it relates to the conduct of John and Robert.

- 6 -

signature, either mechanically or at her direction, or in his capacity as her authorized agent. Cynthia had admitted at deposition that Robert handled the day-to-day operations of Lodi Airport, that she had little involvement with it, and that she deferred to Robert's judgment on documents to be executed on their behalf.

In his motion in limine, Trustee disputed the admission of a statement by Robert in his Alternate Direct Testimony ("ADT"). In the ADT, Robert asserted that upon showing John a copy of the Option in February 2008, John told Robert that he recognized the document and stated that he had forged the signatures so the Option would appear to be an asset for purposes of his application to acquire Galaxy and DOT approval. Trustee contended Robert's statement was inadmissable hearsay being offered for the first time on the eve of trial to exculpate Defendants. Moreover, John had since passed away so Trustee was unable to question him about it. Alternatively, Trustee contended that John's "forgery" statement to Robert should be excluded under FRCP 37 for failing to disclose it in interrogatories.

**C.   The Trial.**

The two-day trial commenced on May 11, 2011. As a preliminary matter, the parties agreed to address the basis of Trustee's motion in limine when Robert testified.

Cynthia testified that she had never authorized John to sign any documents on her behalf, but that John had done so without her authorization in the past. Specifically, when she was away at college, John had signed three credit card applications in

Cynthia's name without her knowledge. John subsequently failed to pay the credit card debts and served time in jail as a result. Cynthia also testified that she had never authorized Robert to sign any document on her behalf, nor did she know of any circumstance in which he had signed something on her behalf without her knowledge.

Robert testified that even though he knew John had purchased Galaxy in 1987, which in Robert's opinion was a "crazy" idea, Robert had no involvement with John's efforts to reinstate Galaxy's operational certificate with the DOT. As for the Option, Robert testified that although the questioned signature looked like his, he did not sign it. Robert again confirmed that once he showed the Option to John in 2008, John admitted faking the document and forging the signatures as a means to acquire Galaxy. Robert testified that he had never seen the Option before February 2008. Robert admitted that he did not disclose John's "forgery" story in the interrogatories because he did not remember it at the time, and he assumed his denial of signing it was sufficient.

On cross-examination, Robert testified that he would never have signed the Option. Robert further testified that Cynthia never authorized him to sign her name on any documents, and he never did so. Finally, Robert testified that John had also obtained credit cards in Robert's name without his knowledge.

Both expert witnesses testified on day two of the trial. Trustee's expert, David Moore ("Moore"), testified that even though the Option was a copy, he found nothing in either signature to suggest they were not naturally written. In other

words, the signatures were not traced. Moore further testified that he had a sufficient amount of known signature exemplars from Robert and concluded that Robert's questioned signature was "probably" genuine. Moore explained that on the scale used by forensic document examiners, with the finding of "did sign it" at the far right end and the finding of "did not sign it" at the far left end, a conclusion of "probably" was just below the finding of "very probably," which was just below "did sign it." Moore further explained that in the middle of the scale is the finding of "no conclusion," which means the evidence is evenly split or insufficient information exists to lean one way or the other. In this case, explained Moore, his finding of "probably" with respect to Robert's signature meant the evidence was strong but some limiting factors existed - i.e., the absence of an original. Because the Option was only a copy, Moore could not exclude the possibility that Robert's signature was a "cut-and-paste." Moore could also not recall an instance where a document contained both a forged signature and a cut-and-paste signature of another.

On cross-examination, Moore testified that he was not asked to determine whether Cynthia's questioned signature was written by Robert. He did opine, however, that since their signatures were so sufficiently dissimilar it would be like comparing apples and oranges, and he would be unable to determine whether or not Robert wrote Cynthia's signature.

Defendants's expert, James Blanco ("Blanco"), testified next. When asked whether it was "probable" that Robert, assuming his signature on the Option was genuine, wrote the questioned "Cynthia Kupka" signature, Blanco replied: "I would say it would

not be probable." Trial Tr. (May 12, 2011) 77:6. On cross-examination, Blanco testified that he saw no evidence of cut-and-paste, but admitted that he was retained only to opine on Cynthia's signature, not Robert's, because Robert had admitted that the questioned signature looked like his. Blanco further testified that he saw no traces of Robert's signature characteristics in Cynthia's signature that indicated Robert signed for her.

After Blanco's testimony, Trustee's counsel asserted that any pending evidentiary objections, particularly all hearsay objections with respect to submitted documents, needed to be resolved before he could present closing argument. The bankruptcy court responded that all exhibits had been admitted as far as it was concerned. During further colloquy on this issue, the court stated that any documents containing hearsay statements of John would be disregarded, to which Trustee's counsel responded:

> Well, your Honor, before you come to that conclusion, there may be some things in there you may regard. You may accept them. You're perfectly capable of weighing the evidence.

Trial Tr. (May 12, 2011) 100:5-8. The court then noted that the primary issue in the case was whether Robert forged Cynthia's signature on the Option. However, it believed Blanco had ruled out that possibility. Furthermore, Robert had testified he had never signed Cynthia's name, and Cynthia had testified she never authorized anyone to sign her name on any document.

Trustee's counsel then stated he had one more witness to call before closing his case in chief. The court asked counsel

- 10 -

for an offer of proof regarding this witness "because at this stage in the game, [Trustee] d[id]n't have a case." Id. at 104:1-2. Counsel offered that this witness would impeach Robert's testimony, to which the court responded: "You have an unfortunate problem there because I happen to believe that [Robert] was a very reliable witness." Id. at 104:13-15. The court then asked counsel whether the witness would impeach Robert's testimony about not signing the Option. Counsel responded that the witness would impeach Robert's testimony about having no involvement in the DOT proceedings. In response, the court stated:

> I don't care about that. I really don't care about that. That's got nothing to do with this case as I see it. And I believe Mr. Kupka's testimony.
>
> . . . .
>
> . . . [A]nd I also believe [Robert's] testimony that all of this has to do with John . . . trying to get some evidence in, trying to get something together to show that he had assets.
>
> . . . .
>
> So how does that ever get you to the point where this option, 30-year-old option, whatever it is, that is not signed by either Mr. Kupka or his sister, how can that possibly result in something that you can enforce?

Id. at 105::21-23; 106:6-15. In the court's opinion, even if Trustee's witness testified that Robert was involved with the DOT proceedings, it would not rehabilitate the Option, which was a "complete nothing." Id. at 108:21. Even if Robert was not telling the truth, opined the court, the outcome remained unchanged because both signatures had to be genuine for a valid Option, and the evidence showed that Cynthia never signed it and never authorized Robert to sign it (or anything else) on her

- 11 -

behalf.

Despite the court's position, Trustee's counsel stated that he still wanted to put on his last witness the following day, to which the court responded: "You may do so." Id. at 110:17. Counsel explained that the witness was the county planner from 1987 who spoke with Robert about moving Galaxy from Florida to Lodi Airport. The court responded that regardless of what the planner had to say, it would not render the Option valid. Furthermore, the evidence showed that John had previously forged Cynthia's name on various documents, and even if Robert had at one time expressed to the county planner an interest in moving Galaxy to Lodi Airport, Robert had testified that he determined the prospect was useless considering Galaxy's debt load. Finally, the court noted that even Trustee's expert could not rule out the possibility that Robert's signature on the Option was a cut-and-paste job.

Upon counsel's further offer of proof about the planner's testimony, the court stated:

> Don't buy it. I have no reason to. As I said, I think Robert Kupka is a reliable witness. I heard him testify. I have no reason to doubt his testimony. I believe him. I believe his sister. And they're both saying, "Hey, we didn't have anything to do with this stupid document." There you are.

Id. at 118:8-14. The court reiterated that Trustee's counsel could call the planner to testify, but that it would not be persuaded:

> You've made your offer of proof, which I think is adequate, I mean, sufficient to at least bring to the attention of any appellate court as to what kind of evidence you were going to bring on, namely, that there was a conversation between [Robert] and the planner that

was in charge, I guess, of Lodi Airport improvements -- that they were talking about bringing [Galaxy] to the Lodi Airport. But, as I said before . . . it doesn't do anything for this bogus document. That document, that option agreement is bogus.

Id. at 121:17-122:3. Counsel then explained that the planner's testimony was not based just on his memory of conversations with Robert, but it was also based on a report that is part of the public record. The court paused momentarily, but ultimately determined the planner's testimony was not going to change the court's mind. As a result, it dismissed Trustee's complaint with prejudice.[6] The court further denied Trustee's motion in limine to exclude John's "forgery" hearsay statement to Robert.

An order denying Trustee's motion in limine was entered on May 17, 2011. A judgment in favor of Defendants was entered on June 8, 2011. This timely appeal followed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(b)(2)(A) and 1334. The order denying Trustee's motion in limine was an interlocutory order that merged into the final judgment. United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, Cal., 545 F.3d 1134, 1141 (9th Cir. 2008) (under the merger rule interlocutory orders entered prior to the judgment merge into the judgment and may be challenged on appeal). Therefore, we have jurisdiction over both the order denying the motion in limine and the judgment under 28 U.S.C.

---

[6] Since the dismissal occurred at the close of the evidence presented on Trustee's case in chief, including his offer of proof, it appears to have been a Judgment on Partial Findings as allowed by FRCP 52(c), as incorporated by Rule 7052.

- 13 -

§ 158.

## III. ISSUES

1.   Did the bankruptcy court clearly err in finding that the Option was invalid?

2.   Did the bankruptcy court abuse its discretion by not having the county planner testify and by admitting the hearsay testimony?

3.   Did the bankruptcy court apply the proper burden of proof?

## IV. STANDARDS OF REVIEW

We review the bankruptcy court's findings with respect to the validity of the Option for clear error.  A finding is clearly erroneous when it is illogical, implausible or "without support in inferences that may be drawn from the facts in the record." United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).  If the trial court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.  S.E.C. v. Rubera, 350 F.3d 1084, 1094 (9th Cir. 2003)(citing Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985)).  Great deference is to be given to the bankruptcy court's determinations on witness credibility due to its opportunity to observe the witness.  Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010)(citing Anderson, 470 U.S. at 575 (1985)).

To reverse an evidentiary ruling, we must conclude that the bankruptcy court both abused its discretion and that the error was prejudicial.  Latman v. Burdette, 366 F.3d 774, 786 (9th Cir.

2004). We review the bankruptcy court's ruling on a motion in limine for an abuse of discretion. United States v. Rude, 88 F.3d 1538, 1549 (9th Cir. 1996). To determine whether the bankruptcy court abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, whether the bankruptcy court's application of the legal standard was illogical, implausible or "without support in inferences that may be drawn from the facts in the record." Hinkson, 585 F.3d at 1261-62.

Whether the bankruptcy court properly applied the correct burden of proof is a question of law reviewed de novo. United States v. Banuelos, 322 F.3d 700, 704 (9th Cir. 2003).

## V. DISCUSSION

We begin by noting that our review of this appeal is hindered due to Trustee's failure to include in his excerpts of record: the complaint, answer, all pretrial motions including the subject motion in limine and related order, the pretrial order, any pretrial statements, Trustee's trial brief, the Alternate Direct Testimony of Robert and Blanco, Blanco's report, the notice of appeal, and the judgment. This is a severe violation of Rule 8009(b) subjecting Trustee's appeal to dismissal. Kyle v. Dye (In re Kyle), 317 B.R. 390, 393 (9th Cir. BAP 2004). Nonetheless, we exercised our discretion to retrieve many of these items from the bankruptcy court's electronic docket, of which we take judicial notice. See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003)(we are free to take judicial notice of relevant documents

on the bankruptcy court's docket). However, the Alternate Direct Testimony of Robert and expert witness Blanco, as well as Blanco's report, were not available.

**A. The bankruptcy court did not clearly err in finding that the Option was invalid.[7]**

Trustee disputes the bankruptcy court's finding that the Option was not valid based on what he believes was compelling evidence to the contrary. In order to reverse the bankruptcy court on this basis, we must conclude that its findings of fact are illogical, implausible, or not supported by the record. <u>Hinkson</u>, 585 F.3d at 1261-62.

Trustee contends he established the Option's validity by the following. The copy of the Option and John's 1987 letter referencing the Option demonstrated its existence. Robert and Cynthia's names appear on the Option, signed by someone. Both experts opined that Robert's signature was probably written by him, and Robert admitted that it looked like his signature. Cynthia admitted that she was unfamiliar with the business dealings of Lodi Airport, and that she would sign documents when Robert advised her to do so. Cynthia also admitted she had little memory of the time period when the Option was executed,

---

[7] Trustee contends the bankruptcy court did not appear to be fully familiar with the written materials submitted by the parties prior to trial and did not have a complete grasp on Trustee's arguments. Trustee further contends the court let Defendants's counsel argue extensively in his opening statement, which likely influenced the court's evaluation of the evidence presented.
First, we see no objections by Trustee's counsel to any of Defendants's opening statement in the transcript. Further, the transcript reflects that the bankruptcy court was familiar with Trustee's legal arguments, but it chose to reject them based on the evidence.

and that she could not remember signing several airport-related documents at the time she signed them. Trustee asserts that even if Cynthia did not sign the Option, the evidence suggests she may have authorized Robert to sign it on her behalf. Thus, contends Trustee, even assuming Cynthia's signature is not genuine, Robert's signing of both their signatures is sufficient to establish their intent to be bound by the Option's terms. In short, Trustee asserts that based on the evidence one of the following must have occurred: either John forged the Option, or Robert signed it and forged Cynthia's signature, either with her authorization or without it.

Although Trustee's scenario of Robert forging Cynthia's signature on the Option is plausible, we also have to consider all of the evidence and testimony offered in this case. In addition to Cynthia's testimony that she would sign documents when Robert advised her to do so, and that she could not remember signing various airport-related documents at the time she signed them, Cynthia also testified that she did not sign the Option. Both experts agreed that Cynthia's signature on the Option was not genuine. Cynthia also testified that she never authorized Robert to sign any document on her behalf, including the Option. As for whether Robert forged Cynthia's signature on the Option, Blanco determined that Robert probably did not, and Moore could not determine that Robert did. Robert testified that he did not forge Cynthia's signature. Robert testified that he did not sign the Option, and both experts could not conclusively rule out the possibility that his signature was a cut-and-paste job. Cynthia and Robert also testified as to John's history of forging his

- 17 -

children's signatures on documents. Furthermore, according to the DOT's OSC, one of the reasons it refused to reinstate Galaxy's operational certificate was John's prior criminal record of lying under oath. The bankruptcy court made explicit findings that Robert and Cynthia were credible witnesses. It also found expert Blanco's testimony more persuasive than expert Moore's.

Even if we as the fact-finder would have weighed the evidence differently, "when there are two permissible views of the evidence, the trial judge's choice between them cannot be clearly erroneous." Village Nurseries v. Gould (In re Baldwin Builders), 232 B.R. 406, 410 (9th Cir. BAP 1999). We cannot conclude on this record that the bankruptcy court clearly erred in finding the Option was bogus. This finding is not illogical, implausible, or without any support in the record viewed in its entirety. Hinkson, 585 F.3d at 1261-62.

**B. The bankruptcy court did not abuse its discretion by not having the county planner testify or by admitting the "forgery" hearsay testimony.**

Trustee contends the bankruptcy court abused its discretion when it "refused" to allow him the opportunity to call the county planner, whose testimony would have impeached Robert's testimony on the key issue of his involvement with John's efforts with the DOT and to bring Galaxy to Lodi Airport. Despite Trustee's failure to disclose the county planner as a witness in the pretrial order, the record clearly shows that the bankruptcy court did not deny Trustee the opportunity to call him. The court considered Trustee's offer of proof regarding the planner's testimony and ultimately concluded that regardless of what he had to say about Robert's involvement with relocating Galaxy to Lodi

- 18 -

Airport, it would not rehabilitate what the court determined was a bogus document. The court went further to say that even if Robert was not being truthful about his involvement with the DOT proceedings, the Option was still invalid because Cynthia never signed it and never authorized anyone else to sign it on her behalf, and to be a valid contract both signatures had to be genuine. We see no abuse of discretion here.

Trustee also contends the bankruptcy court abused its discretion by precluding the admission of relevant documentary evidence demonstrating Robert's involvement in John's affairs that would have discredited Robert and diminished the weight the court could reasonably have placed on his testimony. Trustee fails to state what "documentary evidence" the court failed to admit, but we assume he is referring to the planner's report from 1987. As the bankruptcy court noted, even if Robert was not being truthful about his involvement with relocating Galaxy to Lodi Airport or the DOT proceedings, the planner's documentary evidence could not render the Option valid.

Finally, Trustee contends that the bankruptcy court abused its discretion by admitting the hearsay testimony that John told Robert he forged the signatures on the Option because its admission must have tainted the outcome of his case. "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. FRE 801(c). Unless falling under an exception in FRE 803 and 804, hearsay statements are inadmissible under FRE 802. The "forgery" hearsay testimony was subject to the motion in limine, which the bankruptcy court

denied.  A motion in limine is "any motion whether made before or during trial to exclude anticipated prejudicial evidence before the evidence is actually offered."  <u>Luce v. United States</u>, 469 U.S. 38, 40 (1984).

We agree with Trustee that the bankruptcy court erred by allowing in the "forgery" hearsay testimony.  However, on this record, such error was harmless because it was not the only evidence before the court on the genuineness of the signatures.  Early in the litigation, counsel for Defendants informed Trustee by letter that the signatures on the Option were forgeries.  Admittedly, Defendants did not provide the basis for their position.  Nonetheless, both experts concluded that Cynthia's signature was not genuine.  Moore could not conclusively determine that Robert forged Cynthia's signature, and Blanco determined that Robert had not forged it.  Cynthia testified that she did not sign the Option and did not authorize or tell Robert to sign it on her behalf.  Robert testified that he did not sign Cynthia's name or his name.  Finally, neither expert could rule out the possibility that Robert's signature was not the product of cut-and-paste.  On this record, the bankruptcy court could plausibly have found the Option was invalid without the hearsay testimony.

Accordingly, we cannot conclude the court abused its discretion or that Trustee was unfairly prejudiced by allowing in the "forgery" hearsay testimony.

**C.    The bankruptcy court applied the correct burden of proof.**

Trustee contends the bankruptcy court erred by applying a clear and convincing standard of proof to his declaratory relief

action, rather than the required standard of preponderance of the evidence. Under a preponderance of the evidence standard, the trier of fact is simply required to believe that the existence of a fact is more probable than its non-existence. <u>Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.</u>, 508 U.S. 602, 622 (1993).

Trustee's contention is purely conjecture. He points to nothing specific in the record to support his assertion that the bankruptcy court applied an improper burden of proof. We note that during the trial, Trustee's counsel stated that the burden of proof in this case was preponderance of the evidence. The bankruptcy court expressly agreed. Trial Tr. (May 12, 2011) 116:9-13.

We see nothing in the record to conclude that anything other than a preponderance of the evidence standard was applied. Because we conclude the bankruptcy court applied the proper burden of proof, we need not address Trustee's argument about what the court might have determined with respect to the Option if it had applied a preponderance standard.

## VI. CONCLUSION

Based on the foregoing reasons, we AFFIRM.